# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **BARRY W. TUCKER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:01-CV-2038-RDP** |
| | } | |
| **HOUSING  AUTHORITY  OF  THE** | } | |
| **BIRMINGHAM DISTRICT,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

The court has before it Plaintiff's Motion for Prejudgment Interest, Instatement and Injunctive Relief Or, in the Alternative, for Front Pay (Doc. # 194) filed February 16, 2006, and Defendant's Motion for Judgment Notwithstanding the Verdict, or in the Alternative for a New Trial, or in the Alternative for Remittitur (Doc. # 199) filed February 23, 2006.  The motions have been fully briefed, and the court held oral argument on March 29, 2006.  For the reasons outlined below, the court finds that Defendant's motion is due to be denied and Plaintiff's motion is due to be granted, in part.

## I.      Procedural History

Given that this case has been pending now for almost five years,[1] a brief summary of the procedural history is appropriate to set the stage for the court's discussion of the motions currently before the court.  Plaintiff Barry Tucker commenced this action on August 13, 2001 by filing a complaint in this court against the Housing Authority of the Birmingham District ("HABD") and

---

[1] The court notes that the length and depth of this opinion is directly proportionate to the length and depth of the litigation in this case.  As the docket sheet reflects, the parties in this case were more contentious than most, which resulted in a number of complex issues for this court to resolve during its consideration of the post-trial motions currently before it.

several of its employees.  (Doc. #1).  Tucker later amended his complaint to allege claims against

only HABD and Truman – specifically, Fourteenth Amendment equal protection claims (asserted

under § 1983) against both Defendants and Title VII claims against HABD alone.  (Doc. # 18).

Plaintiff complained that: (1) HABD discriminated against him on the basis of his race (White) and

gender (male) in the terms and conditions of his employment and by terminating him (Doc. # 18

Count One); (2) HABD retaliated against him by not selecting him for a vacant position (Doc. # 18,

Count Two); and (3) HABD and Truman, by engaging in the conduct described in Counts One and

Two, denied him due process of law and the equal protection of those laws in violation of the

Fourteenth Amendment (Doc. # 18, Count Three).

Defendants both filed motions for summary judgment, and Defendant Truman asserted the

defense of qualified immunity. (Docs. # 70, 96).  In his response to Defendants' motions for

summary judgment, Plaintiff abandoned his § 1983 claims against HABD and his due process

claims against both Defendants. (Docs. # 112, 138, 141).  By order dated July 22, 2004, the court

found that certain disputed issues of material fact precluded summary judgment on Plaintiff's

remaining claims, and therefore the court denied both Defendants' motions for summary judgment.

(Doc. # 124).   The court also found that Defendant Truman was not entitled to the defense of

qualified immunity. (Doc. # 124).

Defendant Truman filed an interlocutory appeal of the court's summary judgment ruling,

specifically challenging the court's determination that qualified immunity did not apply to Plaintiff's

claims against her. (Doc. # 125). HABD did not file any briefs on appeal (Doc. # 141), and the

Eleventh Circuit noted that this court's disposition of HABD's motion for summary judgment was

not before it.  (Doc. # 133).  Ruling on Truman's appeal, the Eleventh Circuit found that the First

Amended Complaint was a "shotgun pleading," vacated this court's order denying Truman summary

2

judgment, and remanded the case so that Plaintiff could replead Count Three to allege "precisely what it is that Truman did to deny Tucker . . . equal protection of the law." (Doc. # 133). The Eleventh Circuit also instructed this court to "comb the record to eliminate any material issues of fact, and . . . decide whether Truman's conduct denied Tucker any rights clearly established by Supreme Court or Eleventh Circuit precedent." (Doc. # 133).

On remand, this court ordered Plaintiff to file an amended complaint and issued a scheduling order requiring summary judgment submissions by July 22, 2005. (Docs. # 144, 149). Plaintiff's Restated Complaint alleges the following: (1) HABD intentionally discriminated against Plaintiff because of his race and gender by subjecting him to different terms and conditions and by terminating him; (2) HABD retaliated against Plaintiff by not selecting him for an Assistant General Counsel vacancy; and (3) Truman, while acting under color of state law, intentionally discriminated against Plaintiff on the basis of his race, gender, and in retaliation for protected activity in violation of Plaintiff's constitutional rights under the Equal Protection Clause of the Fourteenth Amendment (as secured by § 1983). (Doc. # 145).

Truman filed a second motion for summary judgment addressing the merits of Plaintiff's claims and asserting again the defense of qualified immunity. (Doc. # 150). HABD filed a "Notice of Defendant HABD's Intent to Adopt Dispositive Motion of Moving Party," noting that "[t]here are similarity of issues between the plaintiff's claims against Ms. Truman and the claims against HABD." (Doc. # 151).

By memorandum opinion and order dated September 28, 2005 (Docs. # 154,155), the court granted Defendant Truman's motion for summary judgment on both the merits of the claims against her and on her qualified immunity defense. The court denied Defendant HABD's motion for

summary judgment and held a pretrial conference on December 6, 2005 on the Plaintiff's claims against HABD. Trial was set for late January 2006.

In anticipation of trial, motions *in limine* were filed by both parties, and the court held hearings and ruled on the motions. After postponing the trial for one day in order to allow the parties to submit additional authority on one of the issues briefed in the motions *in limine*, a jury was selected on February 1, 2006. The case proceeded to trial on Plaintiff's claims of sex and race discrimination predicated upon HABD's decision to terminate his employment, and on his retaliation claim predicated upon HABD's failure to re-hire Plaintiff for an attorney position. Plaintiff rested his case on February 6, 2006, and the court denied Defendant's Rule 50(a) motion. (Doc. # 210, at 768-70). Defendant rested that same day, and the court denied Defendant's renewed Rule 50(a) motion. (Doc. # 210, at 773-74). The court then held a charge conference and received no objections from either party to the jury instructions or the special verdict form. (Doc. # 207, at 65; Doc. # 210, at 773-74, 826).

The case was argued and the jury instructed on February 6, 2006. After approximately one hour of deliberations, the jury returned a verdict in Plaintiff's favor on all counts. As reflected by the special verdict form utilized by the court, the jury found from a preponderance of the evidence that the Plaintiff's race or gender was a substantial or motivating factor that prompted Defendant to discharge him and that Plaintiff would not have been discharged from employment for other reasons in the absence of Defendant's consideration of Plaintiff's race or gender. (Doc. # 210, at 830-31). The jury also found from a preponderance of the evidence that Plaintiff was retaliated against by not being rehired for filing an EEOC charge and/or this lawsuit and that Defendant would have rehired Plaintiff in the absence of consideration of the EEOC charge and/or lawsuit. (Doc. # 210, at 831). The jury awarded damages to compensate Plaintiff for a net loss of wages and

benefits in the amount of $93,990.38.  (Doc. # 210, at 831).  The jury also awarded damages to compensate Plaintiff for emotional pain and mental anguish in the amount of $100,000. (Doc. # 210, at 831).[2]

Plaintiff now seeks equitable relief in the form of reinstatement (or instatement) or front pay and prejudgment interest.  (Doc. # 194).  Defendant seeks judgment notwithstanding the verdict or, in the alternative, a new trial or remittitur of the jury's damage award.  (Doc. # 199).  The court will first address Defendant's motions and then will discuss Plaintiff's requests for equitable relief.

## II.     Defendant's Post-Trial Motions

### A.     Legal Standards for Evaluating Motions Pursuant to Rules 50 and 59

Defendant challenges the weight and sufficiency of the evidence supporting the jury's verdict by moving for both judgment notwithstanding the verdict pursuant to Federal Rule of Civil Procedure 50(b)[3] and a new trial pursuant to Rule 59.  Defendant also challenges, pursuant to Rule 59,  the propriety of the court's decision to admit certain evidence.  The standards for a motion for judgment notwithstanding the verdict and a motion for new trial are different.  The Supreme Court previously has discussed the interplay between these two types of motions:

---

[2] At trial, the parties agreed that punitive damages are not available against Defendant.

[3] The court finds that Defendant's Rule 50(b) motion is a  "proper Rule 50(b) motion," because the necessary predecessor Rule 50(a) motion raising the same grounds was filed at the close of the trial. (Doc. # 210, at 768-70, 773-74). *See Mark Seitman & Assocs. v. R.J. Reynolds Tobacco Co.*, 837 F.2d 1527, 1531 (11th Cir. 1988) ("A defendant's [Rule 50(a)] motion for directed verdict at the close of the plaintiff's case will not suffice unless it is renewed at the close of all the evidence."); *Sims' Crane Serv. v. Ideal Steel Prods., Inc.*, 800 F.2d 1553, 1557 (11th Cir. 1986) (reversing the district court's grant of defendant's Rule 50(b) motion because the defendant had never moved for directed verdict under Rule 50(a)); *Shannon v. BellSouth Telecomms., Inc.,* 292 F.3d 712, 717 n.3 (11th Cir. 2002) ("If a party asserts new grounds in its [Rule 50(b)] motion for judgment as a matter of law that it did not assert in its initial [Rule 50(a)] motion for judgment as a matter of law, a court may not rely on the new grounds to set aside the jury's verdict." (quotation omitted)).

> Each motion . . . has its own office. The motion for judgment cannot be granted unless, as matter of law, the opponent of the movant failed to make a case and, therefore, a verdict in movant's favor should have been directed. The motion for a new trial may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury.

*Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).

Specifically, a Rule 50(b) motion for judgment as a matter of law as to a particular issue should be granted when "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-movant] on that issue." Fed. R. Civ. P. 50(a)(1); *Wood v. Green*, 323 F.3d 1309, 1312 (11th Cir. 2003); *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2002). When, as here, the merits of the motion turn on the sufficiency of the evidence, "[t]he court should review all of the evidence in the record, draw all reasonable inferences in favor of the non-moving party, and disregard all evidence favorable to the moving party that the jury is not required to believe." *Akouri v. State of Florida Dept. of Transp.,* 408 F.3d 1338, 1343 (11th Cir. 2005) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000)). *See also Russell v. N. Broward Hosp.,* 346 F.3d 1335, 1343 (11th Cir. 2003); *Brochu v. City of Riviera Beach,* 304 F.3d 1144, 1154 (11th Cir. 2002). "Credence should also be given to 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Akouri,* 408 F.3d at 1343 (citing *Reeves*, 530 U.S. at 150-51). However, it is the task of the jury, not the court, "to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (internal quotation marks omitted). Therefore, "[i]f reasonable jurors could reach

different results, [this court] must 'not second-guess the jury or substitute our judgment for [the jury's] judgment.'" *Brochu,* 304 F.3d at 1155 (quoting *Lipphardt*, 267 F.3d at 1186).

On the other hand, Rule 59 permits the court to grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a).  A judge should grant a motion for a new trial when "the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984) (internal quotations and punctuation omitted). "Because it is critical that a judge does not merely substitute his judgment for that of the jury, 'new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great - not merely the greater - weight of the evidence.'" *Lipphardt*, 267 F.3d at 1187(quoting *Hewitt*, 732 F.2d at 1556).

The Eleventh Circuit has recognized that "'[n]ew trials granted because (1) a jury verdict is against the weight of the evidence may be sharply distinguished from (2) new trials ordered for other reasons: for example, evidence improperly admitted, prejudicial statements by counsel, an improper charge to the jury or newly discovered evidence.'" *Deas v. PACCAR, Inc*., 775 F.2d 1498, 1504 (11th Cir. 1985) (quoting *O'Neil v. W.R. Grace & Co.*, 410 F.2d 908, 914 (5th Cir. 1969)).   In this case, Defendant has moved for a new trial on both grounds.

> In the first instance given, it is the jury itself which fails properly to perform the functions confided to it by law. In the latter instances something occurred in the course of the trial which resulted or which may have resulted in the jury receiving a distorted, incorrect, or an incomplete view of the operative facts, or some undesirable element obtruded itself into the proceedings creating a condition whereby the giving of a just verdict was rendered difficult or impossible. . . . Under these conditions there is no usurpation by the court of the prime function of the jury as the trier of the facts and the trial judge necessarily must be allowed wide discretion in granting or refusing a new trial. But where no undesirable or pernicious

7

element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury. . . .

*Deas*, 775 F.2d at 1504 (quoting *O'Neil*, 410 F.2d at 914).

In addition to his motions challenging the weight and sufficiency of the evidence supporting the jury's verdict and the court's evidentiary admissions, Defendant also alternatively has moved for remittitur of the jury's damage awards of back pay and emotional distress. A different standard applies to the court's consideration of this requested relief. "In general, a remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence." *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1448 (11th Cir. 1985)(reviewing jury award of compensatory damages under the ADEA and citing *Howell v. Marmpegaso Compania Naviera, S.A.*, 536 F.2d 1032, 1034-35 (5th Cir. 1976) and *Natco, Inc. v. Williams Bros. Eng'g Co.*, 489 F.2d 639, 641 (5th Cir. 1974)). The Eleventh Circuit has held that "[o]nce a defendant is found liable for the plaintiff's injury, the District Court has a great deal of discretion in deciding the level of damages to be awarded." *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir. 1999). "Where the jury's decision has been approved by the trial judge, [the appellate court] will not disturb the award except where [the] verdict is so gross as to be contrary to right reason or to be a clear abuse of discretion." *Hatfield v. Anthony Forest Prods. Co.*, 642 F.2d 175, 178 (5th Cir. Unit A Apr. 1981),[4] *cited with approval in*, *Agro Air Assocs., Inc. v. Houston Cas. Co.*, 128 F.3d 1452, 1455 n.5 (11th Cir. 1997). In this case, because the jury awarded damages for emotional distress, the court was "particularly deferential to the fact

---

[4] The Eleventh Circuit adopted the case law of the former Fifth Circuit on September 30, 1981. *See Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

finder's determination of compensatory damage awards for intangible, emotional harms because the harm is so 'subjective and evaluating it depends considerably on the demeanor of the witnesses.'" *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1315 (11th Cir. 2001) (quoting *Ferrill*, 168 F.3d at 476); *see also Bogle v. McClure*, 332 F.3d 1347, 1359 (11th Cir. 2003).

With these standards in mind, the court will now turn to its substantive analysis of Defendant's motions.

### B.   Defendant's Rule 50(b) Motion Challenging the Sufficiency of the Evidence To Support the Jury's Finding on Plaintiff's Discrimination Claim

Defendant argues that Plaintiff did not present evidence sufficient to support a jury verdict in his favor with regard to his Title VII claim that his position was terminated as a result of race and/or gender discrimination. The court disagrees for the reasons outlined below.

As an initial matter, the court notes that the proper inquiry at this stage of the litigation focuses on whether sufficient evidence supports a jury finding that Plaintiff met the **essential elements** of his claims – not, as erroneously argued by Defendant's motion, the elements of each claim's *prima facie* case. (Doc. # 199, at 4).   In fact, the Eleventh Circuit has explained that, although the *prima facie* case is initially an important part of the *McDonnell Douglas* framework for proving claims with circumstantial evidence, "both the Supreme Court and this [Circuit] have repeatedly recognized that there is a point at which a trial has progressed too far to revisit the question of whether one exists. That point is 'when the defendant fails to persuade the district court to dismiss the action for lack of a *prima facie* case, and responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection.'"  *Collado v. United Parcel Serv., Co.,* 419 F.3d 1143, 1150 (11th Cir. 2005) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-15 (1983)); *accord, e.g.*, *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 67-68 (1986);

9

*Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004) ("After a trial on the merits, an appeals court should not revisit whether the plaintiff established a *prima facie* case. . . . The only relevant question becomes whether Cleveland's termination was motivated by her disability."); *Tidwell v. Carter Prods.*, 135 F.3d 1422, 1426 n.1 (11th Cir. 1998) ("Our task is not to revisit whether the plaintiff below successfully established a *prima facie* case of discrimination. . . . [T]he question of whether the plaintiff properly made out a *prima facie* case is no longer relevant."); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1539 n.11 (11th Cir. 1997) (finding that because a full trial on the merits had been held, "the question of whether Combs properly made out a *prima facie* case is no longer relevant") (quotation omitted); *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 806 (11th Cir. 1995) ("Richardson argues on appeal that the district court erred by visiting whether he had established a *prima facie* case of discrimination after the action was fully tried on the merits, in violation of [ Aikens]. We agree that it was wrong for the court to follow this procedure.").

In this case, the litigation has progressed to the point at which it would be improper to revisit the *prima facie* analysis of Plaintiff's claims. "Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, the focus should no longer be on the preliminary question of the *prima facie* case but on the 'ultimate question of discrimination *vel non*.'" *Collado,* 419 F.3d at 1150-51 (quoting *Aikens*, 460 U.S. at 713-15).[5]  The Eleventh Circuit has clarified that this "don't-look-back rule" applies after the district court has determined that Plaintiff "made out a *prima facie* case and [has denied Defendant's] Rule 50(a)

---

[5]Although the rule prevents an inquiry into the *prima facie* case after all of the evidence is in, it does not prevent an inquiry into the existence of an element of the claim, even if that element of the claim is also a component of the *prima facie* case.  *Collado,* 419 F.3d at 1152-53.

motion on that ground." *Collado,* 419 F.3d at 1151.  Here, Defendant's initial Rule 50(a) motion was made orally at the close of Plaintiff's evidence on the basis that Plaintiff failed to establish the *prima facie* elements of his discrimination and retaliation claims (Doc. # 210, at 768-70), and was renewed at the close of all the evidence before the case was submitted to the jury (Doc. # 210, at 770, 773-74).   Both motions were denied by the court.   (Doc. # 210, at 768-70, 773-74).  Accordingly, it is no longer proper for the court to revisit the analytical, preliminary question of whether Plaintiff made out a *prima facie* case.

Based upon this analysis, as to Plaintiff's discriminatory termination claim, the relevant inquiry is whether he successfully proved by a preponderance of the evidence at trial that he was discharged from his employment and that his race or his gender was a substantial or motivating factor that prompted Defendant to take that action  (Eleventh Circuit Pattern Jury Instruction 1.2.1),[6] not whether he has satisfied the modified *prima facie* case for reduction-in-force cases to which Defendant's arguments are addressed (Doc. # 199, at 4)(citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990)).   Nonetheless, despite the fact that Defendant's arguments are guided by the wrong legal framework, when the court focuses on the substance and not the style of those arguments, it finds that this a distinction without a difference, at least with respect to Plaintiff's discrimination claim.   As illuminated best by Defendant's reply brief, its three main contentions go to the heart of the ultimate question of discrimination *vel non*, not to specific elements of the *prima facie* case: (1) whether the evidence was sufficient to show that Truman was

---

[6]  Stated another way, Plaintiff must prove by a preponderance of the evidence: (1) the employer's discriminatory animus toward the employee based on the employee's protected characteristic; (2) a discharge or other significant change in the terms or conditions of employment; and (3) a causal link between the two. *Stimpson v. City of Tuscaloosa,* 186 F.3d 1328, 1331 (11th Cir. 1999); *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1245-46 (11th Cir. 1998).

involved in the decision to eliminate Plaintiff's position; (2) whether the evidence supported a finding that Truman bore racial or gender animus against Plaintiff; and (3) whether sufficient evidence supports the conclusion that Defendant's reasons for reorganization were pretextual. (Doc. # 206). The court will address each argument in turn.

### 1.      Evidence Regarding the Decision-maker

Defendant maintains that the evidence at trial showed that Ralph Ruggs, not Naomi Truman, was the ultimate decision-maker and that Ruggs harbored no discriminatory animus toward Plaintiff. (Docs. # 199, 206). Plaintiff does not endeavor to show that Ruggs was motivated by racial or gender animus (*see* Doc. # 203, at 9-11), and for good reason. The evidence at trial was not sufficient to support such a finding. However, because Ruggs and Truman were the only decision-makers identified by Plaintiff, viewing the facts presented at trial (and all reasonable inferences from those facts) in the light most favorable to Plaintiff, the jury's verdict for Plaintiff was necessarily based upon a finding that: (1) Truman participated in the employment decisions at issue and (2) Truman was motivated by discriminatory animus toward Plaintiff.   The court finds that sufficient evidence was presented at trial to support both findings, as outlined below.

First, the court finds that Plaintiff presented sufficient evidence from which a reasonable jury could conclude that Truman was a decision-maker with respect to the alleged discriminatory termination of his job.  It was undisputed at trial that Truman recommended a "conversion" or "reorganization" of the legal department that included the elimination of an attorney position. (Doc. # 208, at 180-81, 255).  It is well-established that discriminatory animus by someone who was not a final decision maker, but who was nonetheless an "integral part of the multi-level hiring process," may influence the final decision maker and "taint[ ]" the entire process. *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir. 1999).  The Eleventh Circuit has opined that:

> Disparate treatment analysis requires that none of the participants in the decision-making process be influenced by [discriminatory] bias. . . . Thus, the motivations of both the [decision maker] and [the recommender] are pertinent. If the [decision maker was] not motivated by racial animus but [the recommender was], the [decision maker's] neutrality with respect to race would not cure [the recommender's] racial bias.

*Jones v. Gerwens*, 874 F.2d 1534, 1541 n.13 (11th Cir. 1989).  In *Stimpson v. City of Tuscaloosa,* 186 F.3d 1328 (11th Cir. 1999), the court noted that:

> One way of proving that the discriminatory animus behind the recommendation caused the discharge is under the "cat's paw" theory . . . . [which] provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee.  In such a case, the recommender is using the decisionmaker as a mere conduit, or "cat's paw" to give effect to the recommender's discriminatory animus.

*Stimpson,* 186 F.3d at 1332 (citing *Llampallas*, 163 F.3d at 1249).[7]  In that case, the recommender effectively becomes the decisionmaker, and the "titular 'decisionmaker' is a mere conduit for the [recommender's] discriminatory animus." *Llampallas*, 163 F.3d at 1249.

In support of its argument that Ruggs was the sole decision-maker, Defendant focuses on the evidence that Ruggs ultimately approved the reorganization based upon his reasoning that "because of the expanded amount of work we were projecting that we would be able to accomplish by bringing in two paralegals versus having one attorney position."  (Doc. # 206, at 3, citing Doc. #

---

[7] At least one district court has opined that the strict standard set forth in *Stimpson* "runs contrary to well-established Eleventh Circuit precedent . . . that states that when a recommendation of a non-decision maker who was motivated by racial animus influences the final employment decision, that racial animus should be imputed to the ultimate decision maker." *Boyce v. Belden*, 2002 WL 171697, at *10 n.3 (M.D. Ga. 2002) (observing that "*Stimpson* makes no reference to cases applying the inference to claims of race discrimination, but rather relies solely on the standard set out for supervisor liability in sexual harassment cases in reaching its conclusion.").  In this case, however, under either standard, the court finds sufficient evidence for a jury to find in favor of the Plaintiff on his discrimination claims.

208, at 295).[8]  Defendant maintains that this portion of Ruggs' testimony undermines Plaintiff's "cat's paw" theory that Ruggs' approval of the reorganization was a direct result of Truman's recommendation.  (Doc. # 206, at 3).  The court finds, however, that (1) Defendant's focus on this small part of the trial testimony, which was prompted by a question from defense counsel asking Ruggs to outline his "reasoning or reason for making that conversion" (Doc. # 208, at 295), ignores the totality of the evidence and (2) the totality of evidence was sufficient to support a finding that Truman's discriminatory animus infiltrated the decision to eliminate Plaintiff's position.

In fact, a thorough review of the evidence presented at trial reveals testimony from which a reasonable jury could conclude that although the ultimate approval of Truman's budget and staffing recommendations rested with Ruggs and the Board of Commissioners (Doc. # 207, at 161-62, PX 63; Doc. # 208, at 181), Truman sufficiently participated in the elimination of Tucker's position such that Ruggs and the Board were mere conduits for Truman's discriminatory animus. Ruggs admitted that he merely approved the conversion (Doc. # 208, at 295), and that Truman initiated the decision to eliminate one of the two attorney positions in the Legal Department. (Doc. # 208, at 255).  At least one other witness testified that Truman boasted that she came up with the idea to eliminate an attorney in the place of two paralegals, (Doc. # 208, at 400- Fagan), and Truman herself admitted that she proposed the reorganization, which she termed a "conversion." (Doc. # 208, at 180-81).[9]

---

[8] The court notes that most of Defendant's citations to the trial transcript do not correspond with the correct page citations in the final trial transcripts.  (Docs. # 207-210).  Accordingly, when the court refers to portions of the trial transcript cited by Defendant in its brief, the court has corrected the citations.

[9] Although Truman attempted to downplay her role by suggesting that she merely "recommended what had already been discussed" even before Tucker began working at HABD, (Doc. # 208, at 180), the only written evidence of a proposal eliminating an attorney position was Truman's March

Defendant points to Ruggs' testimony of his "reasoning" for the conversion as evidence that he "independently investigat[ed]" the merits of the reorganization before approving it (Doc. # 206, at 3, citing Doc. # 208, at 295 and *Stimpson,* 186 F.3d at 1332).  The court finds there is sufficient evidence supporting the opposite conclusion – that Ruggs gave Truman's recommendation only a cursory review, not an independent investigation, before approving it and passing the proposal on to the Board for rubber-stamping.  First, the "reasoning" articulated by Ruggs at trial was nothing more than a regurgitation of the same "justification" Truman offered for the conversion (*compare* Doc. # 208, at 295 *with* PX63, Doc. # 207, at 160-62),[10] which does not evidence an "independent investigation" of the proposal. Moreover, the testimony at trial showed that, as head of the Legal Department, Truman had made recommendations to Ruggs in the past regarding departmental staffing (Doc. # 211, at 4-5, 7; Doc. # 207, at 104-06,159-74, PX53-PX60; Doc. # 208, at 232-33), which were consistently followed by Ruggs almost without exception. (Doc. # 211, at 10-12; Doc. # 207, at 114-15).[11]  Finally, the jury could have concluded that it was Ruggs' standard practice to adopt in total Truman's staffing recommendations given that after the reorganization, Ruggs admitted that his decision not to fill a previously posted Legal Department attorney position was

_____

2000 budget recommendation  (Doc. # 208, at 180, PX 63), and Ruggs testified that, prior to that 2000 recommendation, he had not heard the proposal that an attorney position be converted to paralegal positions.  (Doc. # 208, at 256).  Thus, the jury could have concluded that Truman was not being truthful when she suggested the elimination of an attorney position was not originally her idea.

[10] Although trial witnesses were excluded from the courtroom until the time that they were called to testify, Ruggs was designated as the corporate representative for Defendant and therefore present for all of the witness testimony, including the testimony of Truman, who was called as the first witness.

[11] In fact, at oral argument on Defendant's Rule 50(a) motion, counsel for Defendant could recall only one instance when Ruggs made a decision without Truman's input.  (Doc. # 211, at  11).

prompted by Truman's opinion that her office was functioning "smoothly" without the extra help. (Doc. # 208, at 263-64).

The court also finds unpersuasive Defendant's argument that Truman did not participate in the ultimate decision to eliminate *Plaintiff's* position (as opposed to the other attorney position in the Department) because Ruggs and Pat Carter from Human Resources made that decision by themselves, based upon the concept of seniority in the personnel manual. (Doc. # 211, at 5-6; Doc. # 208, at 258-59, 315). In fact, Truman testified that when she recommended the elimination of an attorney position, she knew that Tucker was the least senior attorney in the Department and that it was her understanding that seniority would dictate reduction-in-force decisions. (Doc. # 208, at 180).[12] Thus, the jury could have concluded that Truman's recommendation to Ruggs that "a position" be eliminated was merely a euphemistic recommendation that *Tucker's* position be eliminated.[13] Considering the totality of the trial evidence, the court finds that sufficient evidence was presented for a reasonable jury to conclude that Truman was an "integral part of the multi-level hiring process," and that she "taint[ed]" the entire process. *Schoenfeld*, 168 F.3d at 1268.

As a final point on the issue of Truman's participation in the elimination decision, the court dismisses Defendant's suggestion that the court's grant of summary judgment in favor of Truman

---

[12] Although Truman attempted to back-track and label the reorganization as a "conversion" rather than a "reduction-in-force," this game of semantics could properly have been discredited by the jury. (Doc. # 208, at 180-81).

[13] The court notes that although the HABD's Human Resources Policy Manual actually does not explicitly obligate HABD to base elimination decisions on seniority – it provides that a laid-off employee *may* displace a less senior employee if he give proper notice of his intention to do so (HABD Dep. at Ex. 2, Section 4.8.2) – the exact wording of the policy is of no import given that Truman, Ruggs, and Carter all testified that they *interpreted* the policy to require elimination decisions to be based on seniority. (Doc. # 208, at 180 (Truman), 258-59 (Ruggs), 315 (Carter)).

on Plaintiff's individual capacity § 1983 claims is inconsistent with a finding at trial that Truman participated in the employment decisions challenged by Plaintiff. (Doc. # 199, at 7 n.3.; Doc. # 206, at 4). This court found insufficient evidence *in the summary judgment record* to show Truman's involvement in the decisions at issue and therefore granted summary judgment in favor of Truman on the merits of the individual claims against her and on her defense of qualified immunity. (Docs. # 154, 155; *see also* Doc. # 211, at 44-45). Not only do the standards differ for liability at trial and liability at the summary judgment stage, especially on the defense of qualified immunity, but the limited evidence which was available to the court in the summary judgment record differs greatly from the vast evidence presented at trial.

For example, the evidence available to the court at summary judgment was *undisputed* that Ruggs alone, and not Truman, decided to eliminate Plaintiff's position. The only evidence proffered at that point showed that, although Truman was in favor of the 2000-01 budget proposal to eliminate an attorney position and replace it with two paralegals (Truman Dep. at 26-28), Ruggs submitted the budget for approval by the Board (Truman Dep. at 26-28; HABD Dep. at 56-58), and Ruggs consulted with Human Resources to determine the appropriate process of selecting the position to be eliminated. (Carter Dep. at 108-11). The court did not have the benefit of Ruggs and Truman's trial testimony which indicated that Truman not only was in favor of the reorganization, but actually recommended it. Therefore, based on that undisputed evidence showing that only Ruggs took action to eliminate Plaintiff's position, the court concluded that Truman was due summary judgment on the merits of Plaintiff's § 1983 claims, and alternatively due qualified immunity.[14] At trial, however,

---

[14] Because the court also granted Truman's summary judgment based upon qualified immunity, there was no occasion at trial for the court to reconsider its order based upon the new evidence indicating she was indeed involved in the decision to eliminate Plaintiff's position.

Ruggs admitted that the decision to eliminate one of the two attorney positions in the Legal Department was initiated by Truman. (Doc. # 208, at 255). At least one other witness testified that Truman boasted that she came up with the idea to eliminate an attorney in the place of two paralegals, (Doc. # 208, at 400- Fagan), and Truman admitted that she proposed the reorganization, which she termed a "conversion." (Doc. # 208, at 180-81). Accordingly, the jury had the benefit of evidence which was not before the court in the Rule 56 record.

Although Plaintiff also argued at summary judgment that Truman *indirectly* influenced Ruggs' decision by "targeting" Plaintiff's position for elimination, his argument at that time was based on evidence that did not support his analysis. Plaintiff pointed only to the language in HABD's Human Resources Policy Manual as evidence that Truman "must have known" that Plaintiff's job would be selected for elimination. However, as noted in footnote 13 *supra*, the manual merely permits a laid-off employee to displace a less senior employee if that employee gives proper notice to HABD, (HABD Dep. at Ex. 2, Section 4.8.2), it does not *obligate* HABD to base lay-off decisions on seniority. Because Plaintiff's cited evidence did not support his theory, and because the summary judgment record was devoid of any other evidence that Truman knew the decision would be based on seniority or that she otherwise influenced, directly or indirectly, the decision to eliminate Plaintiff's position, summary judgment was appropriate in favor of Truman. As the court has already outlined, at trial it became irrelevant what the manual officially required with respect to elimination decisions, because Truman, Ruggs, and Carter admitted that – separate and apart from what the manual provided – they interpreted HABD policies to require elimination of the least senior employee, and Tucker admittedly knew that Tucker had less seniority than Rosenbaum. (Doc. # 208, at 180). Thus, unlike the court on summary judgment, the trier of fact

18

was presented with sufficient evidence to support Plaintiff's theory that Truman "targeted" his position.

Moreover, at the summary judgment phase, this court was faced with Truman's qualified immunity defense, which offers complete protection for government officials sued in their individual capacity if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Providing sufficient evidence at trial to show that Truman was "integral part of the multi-level hiring process," who "tainted" the entire process, *Schoenfeld*, 168 F.3d at 1268, is a much lighter burden of proof than overcoming her qualified immunity defense at the summary judgment stage. Thus, as evidenced by the above examples, the court's prior summary judgment ruling does not (and cannot) bind this court to find insufficient evidence that Truman participated in the employment decisions at issue.

Having determined that sufficient evidence was presented such that a jury could conclude that Truman participated in the elimination of Plaintiff's position, the court must now analyze whether sufficient evidence supports a finding that Truman's decision was motivated by discriminatory animus toward Plaintiff.

### 2.      Evidence Regarding Truman's Discriminatory Animus

Defendant next maintains that insufficient evidence was presented at trial to support a finding that Truman acted out of discriminatory animus toward Plaintiff. To the contrary, the court finds ample evidence from which a reasonable jury could conclude that Truman bore racial animus.[15]

_____

[15] In opposition to Defendant's Rule 50(a) motion, Plaintiff points only to evidence of Truman's *racial* animus against Plaintiff, not gender animus. (Doc. # 203, at 10-11). The court need not

In addition to Tucker's testimony that Truman called him a "racist," which he interpreted to be a "derogatory slur" (Doc. # 210, at 744-45), at least three other witnesses testified that Truman made comments that could be race-based and that tended to show an animus against white employees. Frank Jones, a white male, testified that Truman "read [him] the riot act for getting involved in her cases," and she told him that the only reason their outside counsel on the case chose to contact him instead of her is because he is white and she is African-American. (Doc. # 208, at 303-05). Valerie Fagan, an African-American female (Doc. # 208, at 184), testified that Truman questioned her association with Faye Rosenbaum, a white attorney in the office, and asked her "why do I have so much to do with white people" or "what do you have so much in common with [white people]." (Doc. # 208, at 382-85). Fagan also testified that Truman repeatedly deterred her from contact with Rosenbaum, ordering Fagan "not to ask Faye anything. And I remember her distinctly saying I would be better off asking a pencil." (Doc. # 208, at 386-87). Truman informed Fagan on several occasions that she "was the only black that Faye [Rosenbaum] talks to." (Doc. # 208, at 389-90). Truman also "lashed out" at Fagan for speaking to a White person in accounting. (Doc. # 208, at 411-12).

---

determine whether sufficient evidence supports both a gender discrimination *and* a race discrimination claim, however, given that the verdict form, which was approved without objection by counsel (Doc. # 210, at 773-74), asked only "Do you find by a preponderance of the evidence, 1(A) that the plaintiff's race **or** gender was a substantial or motivating factor that prompted the defendant to discharge him?" and if so, "1(B) that the plaintiff would have been discharged from employment for other reasons even in the absence of defendant's consideration of the plaintiff's race **or** gender?" (Doc. # 210, at 830-31) (emphasis added). Because the jury answered "yes," to question 1(A), and "no" to question 1(B) (Doc. # 210, at 830-31), this court need only consider whether sufficient evidence supports a finding that *either* race or gender motivated Defendant's decision to eliminate Plaintiff's position, because the jury could have found that either basis for discrimination was supported by the evidence here.

Faye Rosenbaum also testified that Truman told her that she was "on to Barry [Tucker] and I and she knew that we were teamed up against her and that it was a 'us' and 'them' situation and she just wanted to let me know that she was aware of it and would proceed accordingly."  (Doc. # 209, at 438).  When Rosenbaum responded that she did not know what Truman was talking about, Truman responded "oh, we are going to play that little game, are we. Well, I just want you to know that I can play that game too . . . basically letting me know that the lines had been drawn and there were two teams here, and that's how we would proceed from that point on." (Doc. # 208, at 438-39). Rosenbaum interpreted Truman's affront to be a warning that Truman perceived the White employees and the African-American employees to be at war. (Doc. # 209, at 438-39).[16]

That some of the above testimony referred to statements that were not overtly race-based is of no import in light of the Supreme Court's recent finding that even superficially benign statements may be probative of racial animus because a speaker's meaning can depend on various factors including context, inflection, tone of voice, and local custom. *Ash v. Tyson Foods, Inc.*, 126 S.Ct. 1195, 1197 (2006). Accordingly, the court finds that a reasonable jury could have inferred racial animus from the totality of the testimony at trial regarding comments made by Truman, even in the absence of racial epithets. Moreover, although Truman denied making most of those statements (Doc. # 207, at 132, 142-43, 157-58; Doc. # 208, at 187-88), the jury could have believed the witnesses, and not Truman.  It is not the role of this court "to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Lipphardt*, 267 F.3d at 1186.  Because the

---

[16] Defendant's argument that these statements "do nothing more than suggest that Truman feared that **others** bore a racial animus against **her**" (Doc. # 206, at 5-6) (emphasis in original), is without merit given Rosenbaum's interpretation of the statements and Fagan's testimony about Truman's feelings toward Rosenbaum.  In any event, even if the statements could be construed as Defendant suggests, it was for the trier of fact to assess them and there was sufficient evidence for the jury to find the statements evidenced racial animus on Truman's part.

court finds that "reasonable jurors could reach different results, [this court] must 'not second-guess the jury or substitute our judgment for [the jury's] judgment.'" *Brochu,* 304 F.3d at 1155 (quoting *Lipphardt*, 267 F.3d at 1186).

Moreover, in addition to the comments made by Truman, several witnesses testified that they received unfair treatment from Truman at work, which a jury could have found to be a result of Truman's racial animus.  Tucker testified that he felt that he was scrutinized more closely than other employees and denied certain access and leave because of his race (Doc. # 209, at 525-549), and at least two other White witnesses testified that Truman treated them unfairly at work.  (*See, e.g.,* Doc. # 208, at 305 (Jones); Doc. # 208, at 442-50 (Rosenbaum)).  Although Truman offered nondiscriminatory reasons for the actions she took against Tucker (Doc. # 207, at 128-57), a jury could have discredited Truman's testimony based on the testimony of other witnesses that was inconsistent with her stated reasons[17] and could have concluded that Truman had a history of treating Tucker differently because of his race.[18]

_____

[17] For example, with respect to one dispute about Plaintiff's leave request, Truman claimed that she did not approve the leave request because it was not appropriate for her to do so because Len Williams, as the person in charge, had to approve the leave. (Doc. # 207, 137-40). Williams disagreed, however, noting that it was within Truman's authority to approve Tucker's leave slip. (Doc. # 209, at 605-06, 606).  Although the court will not compile a laundry list of the many times that other witnesses challenged Truman's explanations for her treatment of Tucker, suffice it to say that sufficient evidence was presented from which a reasonable jury could infer that Truman acted out of discriminatory animus, not for legitimate reasons, when interacting with Tucker.

[18] The court notes that it made clear to the jury, however, that those other incidents regarding access and denial of leave requests were not separate claims, but rather merely background information regarding the relationship between Truman and Tucker that may aid in the jury's determination of whether Truman discriminated against Plaintiff with respect to the elimination of his position.  (Doc. # 207, at 128-29).

The court finds the evidence outlined above, and other evidence contained within the 800+ page trial transcript that was not specifically highlighted by the court in this opinion, to be sufficient for a reasonable jury to conclude that Truman harbored discriminatory animus toward Tucker.

### 3.      Evidence Suggesting Defendant's Reasons for the Reorganization Were Pretextual

Finally, Defendant maintains that Plaintiff failed to show that its stated reasons for the reorganization were pretextual, arguing that the evidence presented at trial consistently pointed to both cost-savings and efficiency as reasons for the conversion of an attorney position to that of two paralegals.  (Doc. # 206, at 6-7).  In analyzing Defendant's arguments, the court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Cooper-Houston v. So. Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).  Applying this standard, the court finds sufficient evidence from which a jury could have determined that Defendant's stated reasons for the reorganization were merely attempts to cover up discrimination against Plaintiff.

First, evidence was presented to the jury from which it could conclude that Defendant's articulated reasons have shifted throughout the course of litigation.  Although Defendant's Rule 50 argument to the court focuses primarily on efficiency as the main goal of the reorganization (Doc. # 199, at 9-11; Doc. # 206, at 6-7), Defendant cannot ignore that during this litigation it also has relied upon cost-savings as an important motivation for the reorganization. (*See, e.g.,* PX78; Doc. # 208, at 282).  However, when and how those reasons first were articulated as motivations for the reorganization was a matter for the jury to decide.  While Defendant's response to Plaintiff's

E.E.O.C. Charge argued that the Assistant General Counsel position was eliminated because the Legal Department budget could not support the Assistant General Counsel position with the two paralegals that were proposed (PX78), Ruggs later doubled-back on that reasoning by testifying at trial that "the basis for what we were doing was not based totally on cost-savings but it was based on having a more efficient operation in the Office of General Counsel." (Doc. # 208, at 282).[19]

Moreover, even with respect to the cost-savings articulated reason, the evidence at trial raised doubts about when a financial analysis of the cost of the conversion was conducted and whether that analysis was conducted merely to manufacture a reason for the reorganization. Although Ruggs testified that "I'm sure that the discussion took place in terms of the financial impact on that before the reorganization was approved" (Doc. # 208, at 280), the testimony was clear that the only documented financial analysis was conducted months after the reorganization to provide "justification concerning cost-savings" in response to Tucker's EEOC charge accusations. (Doc. # 208, at 345, PX 88, *see also* Doc. # 208, at 280-81, 344-45).  Given the totality of the evidence presented at trial, it would certainly be reasonable and within the discretion of the jury to conclude that a shift in Defendant's reasons was itself evidence of the illegal motives suggested by the Plaintiff.  *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1195 (11th Cir. 2004)("[T]he shifting reasons given by [Defendant] allowed the jury to find [its] explanation unworthy of credence, and consequently to infer the real reason was [discrimination].").

Moreover, ample evidence was presented at trial to allow a reasonable jury to question the veracity of each articulated reason.  First, with respect to the financial impact of the reorganization,

_____

[19] It is not insignificant that Plaintiff's counsel called into question the veracity of several aspects of HABD's response to Tucker's EEOC charge (Doc. # 208, at 320-23, PX 80), from which a jury could conclude that the representations made by Defendant in the EEOC charge – including the initial stated reason for the reorganization – were not credible.

the court notes that even Ralph Ruggs, Executive Director and trial representative for Defendant, could not justify how the numbers resulted in a cost-savings to HABD.  Ruggs admitted that the budgeted amounts for attorney expenditures were the same both before and after the reorganization (Doc. # 208, at 269-275, 273, PX 67), and that the elimination of Tucker's position only saved $47,000, while the addition of two paralegals actually added $60,000 to the budget.  (Doc. # 208, at 282).  Ruggs did not attempt to explain how those figures resulted in a cost-savings to HABD, opting instead to shift the focus to the efficiency aspect of the reorganization: "you must keep in mind the basis for what we were doing was not based totally on cost-savings but it was based on having a more efficient operation in the Office of General Counsel." (Doc. # 208, at 282).  Certainly the jury could have reasonably questioned the legitimacy of Defendant's financial justification for eliminating Plaintiff's position.

Moreover, sufficient evidence was presented from which the jury could have determined that efficiency was not the true motivation for the reorganization.   Just a short time before Truman proposed the elimination of an attorney position, she outlined in a memorandum to Ruggs her concern that her department was understaffed, causing her difficulty in managing their "case load averaging approximately 300 cases per month," and requesting an additional staff position that she believed would essentially pay for itself with the "increase in efficiency and productivity." (Doc. # 207, at 168-71).   Despite having recently complained about understaffing in her department, Truman then inexplicably proposed the elimination of one of only two attorney positions in her department.  (Doc. # 208, at 180-81).  Then, after Plaintiff's position was eliminated, when Truman's only other attorney resigned, she again began to increase the number of attorney positions in her department, asking for not one, but two, temporary attorneys to replace the attorney who resigned (Doc. # 208, at 190-91), and effectively replacing the attorney position lost when Tucker's

job was eliminated.  Shortly thereafter, while the two temporary attorneys continued to work for Truman, she proposed adding *even more* attorney positions – a Senior Assistant General Counsel at a cost of $45,000 and contract counsel at a cost of $50,000. (Doc. # 208, at 205-08, PX 75).  The chronology of Truman's staffing requests could have led a reasonable jury to conclude that efficiency was not the motivation behind her decision to eliminate an attorney position when Plaintiff worked in her department.  That decision was simply not consistent with her repeated complaints that her office was understaffed and her well-documented belief that more attorney positions – not less – would increase efficiency in her department.[20]

---

[20] Alternatively, even if Defendant is correct that sufficient evidence was not presented for a reasonable jury to question the Defendant's "efficiency" explanation for the reorganization, this court finds that evidence of pretext as to the stated reason of cost-savings is sufficiently strong to allow a factfinder to conclude that Defendant lacks all credibility *as to both reasons*.  *See Chapman v. A.I. Transport*, 229 F.3d 1012, 1050-51 (11th Cir. 2000) (en banc) (Birch, J., dissenting). Although this Circuit has established as a general rule that when a defendant offers multiple nondiscriminatory reasons for making an employment decision, a plaintiff must offer evidence to refute each of the reasons to withstand judgment as a matter of law, *see Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997) (where plaintiff failed to rebut one of the three reasons, defendant was entitled to judgment as a matter of law on charge of impermissible discrimination); *Chapman*, 229 F.3d at 1037 ("In order to avoid summary judgment, a plaintiff must produce sufficient evidence f or a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual."), *the Eleventh Circuit has left open the question of whether an exception to that general rule might exist in certain cases*.

The dissent in *Chapman* opined that judgment as a matter of law would be inappropriate even if a plaintiff successfully presents evidence of pretext as to some, but not all, of the employer's stated nondiscriminatory reasons if: (1) the nondiscriminatory reasons are so intertwined such that a showing of pretext as to one of the reasons is sufficiently strong to allow a factfinder to conclude that the employer lacks all credibility; (2) there are a large number of reasons proffered; or (3) the employer has offered both an objective and a subjective reason and the objective one is shown to be pretextual. *Chapman*, 229 F.3d at 1050-51 (Birch, J., dissenting). Although the *Chapman* majority rejected that such an exception was appropriate under the facts in *Chapman*, it "express[ed] no view on whether [an] exception might exist in some case with different facts." *Chapman*, 229 F.3d at 1037, n. 30.  The recognition that such an exception should be applied in certain cases would be consistent with the Eleventh Circuit Pattern Jury Instructions, as noted by another district court:

> if the evidence of pretext as to some of the employer's proffered explanations is strong enough to allow a factfinder to conclude that the employer lacks all credibility,

Finally, the court finds that sufficient evidence was presented for a reasonable jury to conclude that the entire "reorganization" or "conversion" premise itself was a sham to oust Tucker because of his race or gender.  *See, e.g., Bogle v. McClure*, 332 F.3d 1347, 1356 (11th Cir. 2003). Although Tucker was undisputedly eligible for rehire (Doc. # 207, at 116-17; PX 8; Doc. # 208, at 257, 316-17), and the reorganization including the hiring of two paralegals to work in the Legal Department, Tucker testified that no one discussed available positions with him (including the paralegal openings) when his job was terminated,[21] and the termination letter HABD mailed to him did not mention the availability of those paralegal positions.  (Doc. # 209, at 551-52, PX35).  Ruggs testified that in other reorganizations at HABD, the downsized employee was offered another position at HABD.  (Doc. # 208, at 257-59).  Nonetheless, Plaintiff occupied the only position ever

---

the plaintiff should be able to survive [judgment as a matter of law because] . . . .This is consistent with common sense and with the Eleventh Circuit's standard pattern jury instructions for civil cases, which instruct jurors that: "You should decide whether you believe what each witness had to say ... [and,] ... in making that decision, you may believe or disbelieve any witness, in whole or in part."

*Alexander v. Chattahoochee Valley Cmty Coll.*, 325 F. Supp. 2d 1274, 1292 n.31 (M.D. Ala. 2004) (quoting Eleventh Circuit Pattern Jury Instructions (Civil Cases), Basic Instructions 3).

The court believes that *if* such an exception is appropriate in certain cases, this is just such a case.  Here, unlike in *Combs* and *Chapman*, Defendant's testimony makes clear that the two articulated reasons for the reorganization – cost-savings and efficiency – were so intertwined that even Defendant could not prioritize one or the other when it became apparent that they may be in conflict.  (*See, e.g.*, Doc. # 208, at 282).  Moreover, in this case there is no doubt that ample evidence disproved Defendant's objective assertion that the reorganization resulted in a cost-savings, and as the *Chapman* dissent recognized, it may be appropriate to relieve a plaintiff of the burden of disproving every proffered reason where, like here, the employer has offered both an objective (here, cost-savings) and a subjective (here, efficiency) reason and the objective one is shown to be pretextual. *Chapman*, 229 F.3d at 1050-51 (Birch, J., dissenting).  If the Eleventh Circuit determines that an exception to the general rule is warranted, the court finds that the facts of this case fit squarely within two of the scenarios articulated by the dissent in *Chapman*.

[21] Testimony from HABD's witnesses was not consistent about whether the paralegal positions were discussed with Tucker when his position was terminated.  (Doc. # 208, at 182-83 (Truman); Doc. # 208, at 315-16 (Carter)).

27

to be eliminated from the Legal Department  (Doc. # 208, at 279), and according to Plaintiff, he was not offered another position despite the availability of positions for which he was undisputedly qualified.  Given these facts, and all of the facts outlined above, the court finds that Plaintiff has presented sufficient evidence casting doubt on Defendant's proffered nondiscriminatory reasons to permit a reasonable jury to conclude that those reasons were not what actually motivated its conduct.

Having analyzed each of Defendant's three principal contentions regarding the sufficiency of the evidence to support a finding of discrimination, and having reviewed the trial transcript with a fine-toothed comb, the court is more convinced than ever that the jury's verdict on this claim was supported by the evidence at trial.

### C.  Defendant's Rule 50(b) Motion Challenging the Sufficiency of the Evidence To Support the Jury's Finding on Plaintiff's Retaliation Claim

Defendant also challenges the sufficiency of the evidence to support the jury's finding of liability on Plaintiff's retaliation claim.  Once again, Defendant's arguments can be synthesized into three main contentions: (1) Plaintiff failed to show a causal connection between his protected activity and the decision not to rehire him; (2) Plaintiff cannot maintain his retaliation claim because the position for which Plaintiff applied was never filled; and (3) Plaintiff failed to dispute Ruggs' legitimate reasoning for withdrawing the position.  (Doc. # 206, at 7-9).[22]  The jury rendered the

---

[22] The court again notes that the proper inquiry at this stage of the litigation focuses on whether Plaintiff met the essential elements of retaliation – not the elements of a retaliation *prima facie* case. Nonetheless, with respect to Plaintiff's retaliation claim, there is essentially no difference between the components of the *prima facie* case and the elements of the claim.  *Compare Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) ("To establish a prima facie case of retaliation, the plaintiff must show that (1)[]he engaged in statutorily protected expression; (2) []he suffered an adverse employment action; and (3) []there is some causal relationship between the two events.") *with* Eleventh Circuit Pattern Jury Instruction 1.10.3 ("Plaintiff must prove by a preponderance of the evidence: (1) that he engaged in statutorily protected activity, that is, that he in good faith asserted objectively reasonable claims or complaints of discrimination prohibited by federal law; (2) that an adverse employment action then occurred; (3) that the adverse employment action was causally

28

following verdict on retaliation: "Do you find from a preponderance of the evidence, question 2 A., that the plaintiff was retaliated against by not being rehired for filing an EEOC charge and/or this lawsuit?  Answer yes or no.  The answer is yes.  Question 2 B, that the defendant would not have rehired plaintiff for other reasons even in the absence of consideration of plaintiff's EEOC charge and/or lawsuit? The answer is no."  (Doc. # 210, at 831).  For the reasons outlined below, the court finds that sufficient evidence supports the jury's finding in favor of Plaintiff on his retaliation claim.[23]

---

related to the Plaintiff's statutorily protected activities; and (4) that the Plaintiff suffered damages as a proximate or legal result of such adverse employment action.").  Moreover, the court notes that Defendant's two main arguments are addressed to the ultimate issue of retaliation *vel non*, not to specific elements of the case.  *See Reeves v. Sanders Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (finding that at this stage of the litigation, "the McDonnell Douglas framework-with its presumptions and burdens-disappear[s], and the sole remaining issue [is retaliation] *vel non*")(internal citations omitted)).

[23] As an initial academic matter, the court notes that although the jury found in favor of Plaintiff on both his discrimination and retaliation claims, the damages that the jury awarded to Plaintiff would likely have been the same even if the jury had found insufficient evidence to support retaliation and had found for Plaintiff only on his discrimination claim.  The jury awarded compensatory damages for both back pay and mental anguish.  (Doc. # 210, at 831) ("Do you find from a preponderance of the evidence, question 3, Roman numeral 3, that the plaintiff should be awarded damages to compensate for a net loss of wages and benefits to the date of trial? The answer is yes. If your answer is yes, in what amount? Answer is $93,990.38. Roman numeral four. That the plaintiff should be awarded damages to compensate for emotional pain and mental anguish. The answer is yes. If your answer is yes, in what amount? The answer is $100,000.").

    With respect to back pay, the court finds that even if the jury was not persuaded that Defendant retaliated against Plaintiff, it nonetheless could have – and likely would have according to the court's back pay instruction – awarded the same back pay amount to Plaintiff on the discrimination claim alone.  The jury was instructed to calculate back pay in the following manner:

> Lost wages, also referred to as back pay, is the amount that the plaintiff would have earned in his employment with defendant if he had remained employed or been reemployed after his application . . . .  If you find for the plaintiff on both the discrimination or retaliation claims, he cannot recover a double back pay award for the same period of time, so you should calculate his lost wages from the earlier date, the date of his discharge up to the date you render your verdict.

The evidence presented at trial showed that after Plaintiff applied in December 2001 for the posted open attorney position at HABD (Doc. # 209, at 570), he heard nothing from Defendant for months about the status of his application.  (Doc. # 209, at 570-71; Doc. # 18).  Assuming that Defendant did not intend to rehire him, and that such decision was in retaliation for the filing of his EEOC charge and/or his August 2001 judicial complaint (Doc. # 1), Plaintiff added a retaliation claim to this lawsuit by filing a First Amended Complaint on March 4, 2002.  (Doc. # 209, at 570-71, 654; Doc. # 18).  Only after Plaintiff alleged retaliation in his amended complaint did Defendant inform Plaintiff that he would be granted an interview for the position. (Doc. # 209, at 572, PX43).  Nonetheless, after he was interviewed, Plaintiff received a letter in May 2002 indicating that he would not be hired for the position because the position had been withdrawn. (Doc. # 209, at 574-75; DX103).[24]

---

(Doc. # 210, at 791-92).  As the Eleventh Circuit has told us, we assume that juries follow the court's legal instructions.  *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1315-16 (11th Cir. 2001)("Absent evidence to the contrary, we presume that juries follow the law as instructed.").  Thus, because the jury found that Defendant discriminated against Plaintiff, it calculated back pay from the earlier date of Plaintiff's discharge to the date of verdict.  Because an award of double back pay is prohibited, the retaliation finding had no impact on the back pay award.  Moreover, although it was theoretically possible that the jury's mental anguish award of $100,000 could have been based upon the emotional distress Plaintiff suffered as a result of both discrimination and retaliation, the mental anguish evidence presented at trial (Doc. # 209, at 590-95), was addressed primarily to the emotional distress suffered as a result of the elimination of his job – in other words, his discrimination claim.  (Doc. # 211, at 18, 37-39).  Therefore, the court notes that it is unlikely that the tangible effect of the jury's verdict – its damage award – would have changed at all even if Plaintiff had been unsuccessful at trial on his retaliation claim.

[24] Defendant's suggestion that Plaintiff's retaliation claim is invalid because he claimed retaliation before he was officially rejected for the position (Doc. # 206, at 297) is simply unconstructive nitpicking.  The evidence is sufficient to show that Plaintiff legitimately assumed that he would not be rehired after three months passed with no word from Defendant regarding his application, and the timing of Defendant's sudden desire to interview Plaintiff for the position is suspicious at best.

The court rejects Defendant's first contention that there was insufficient evidence for the jury to find a causal connection between the protected activity and the retaliatory action. Although the court agrees with Defendant that temporal proximity alone is not sufficient under these facts to establish a causal connection (Doc. # 199, at 16-17), the court finds that Plaintiff presented more than just evidence of temporal proximity. Plaintiff testified that his first official indication of how Defendant intended to treat his application for rehire was the March 20, 2002 motion to dismiss filed by Defendant that "request[ed] the court to enter an order . . . directing submission of plaintiff to withdraw his application from employment thus submitting his reinstatement claim to the court pending the verdict of the jury vesting all authority over plaintiff in the court." (Doc. # 209, at 571-72, PX5; Doc. # 21). Defendant's motion argued that "Plaintiff should not be able to simultaneously seek reinstatement as a remedy and apply for open positions with HABD." (Doc. # 209, at 571, PX5; Doc. # 21). Additionally, Plaintiff presented testimony that the decision to withdraw the position was made only after Ruggs consulted with Truman, whose motivations concerning Plaintiff had already been called into question. (Doc. # 208, at 298). Moreover, the evidence at trial showed that even after the position was withdrawn and Plaintiff was rejected, Defendant later hired a full-time attorney anyway, but only after changing the official title of the position so that it was not the same position for which Plaintiff applied. (Doc. # 211, at 32-36; Doc. # 208, at 221-23, 228-31, PX 98, PX 99, PX 145). This and other evidence at trial was sufficient to permit the jury to conclude that more than just temporal proximity linked Plaintiff's protected conduct and Defendant's decision not to rehire Plaintiff.

The court is likewise not persuaded by Defendant's argument that because HABD eventually withdrew the open position, Tucker cannot now claim retaliation with respect to that position. As one district court opined, "[e]mployment law is not a game of 'Gotcha!®.'" *Williams v. Alabama*

31

*Indus. Dev. Training*, 146 F. Supp. 2d 1214, 1224 (M.D. Ala.2001).  The evidence was sufficient for a jury to conclude that Defendant did indeed fill the open position with an African-American female, but  surreptitiously, by first "withdrawing" the position for which Plaintiff applied and rejecting his application, then changing the name from "Assistant General Counsel" to "Associate Counsel," and finally reposting the position at the same salary grade and range and hiring an African-American female. (Doc. # 208, at 221-23, 228-31, PX 98, 99, 145).  In fact, the testimony at trial suggested that it was none other than Truman who was responsible for requesting that "revision" to the job title. (Doc. # 208, at 318).

     In addition, a jury could have discredited Ruggs' reasoning for the withdrawal of the position and inferred from the evidence presented that decision was withdrawn as an attempt to conceal retaliation.  It is undisputed that the open position posting was not withdrawn until *after* Plaintiff applied and was interviewed for the job (Doc. # 208, at 203-04; 263-64), and "after [Ruggs] discuss[ed] [] with Miss Truman [] how well things were going [without that position]."  (Doc. # 208, at 298).  Although Ruggs attempted to deflect attention away from the suspicious timing of the withdrawal by pointing to the hiring committee's "independent" decision not to recommend Tucker for the position (Doc. # 208, at 298), the explanation that the decision rested with an unbiased hiring committee also could have been discredited by the jury.  Evidence was presented that:  (1) although Defendant initially corresponded with Plaintiff in April 2002 to set up an interview with Plaintiff in early May (Doc. # 209, at 572, PX43), Defendant changed the date for the interview indicating that "the purpose for changing the dates was so that they could create this panel of people to interview [Tucker]"  (Doc. # 209, at 573); (2) most of the hiring committee, comprised of all but one department head, knew that Plaintiff had engaged in protected activity because Truman notified the department heads by memoranda that he had filed a lawsuit (Doc. # 208, at 200-02; *see also* Doc.

# 208, at 259-60);[25] (3) the questions posed by the hiring committee to Tucker were modified at the last minute in a way that could have been influenced by Truman and was intended to discredit and target Tucker (Doc. # 208, at 327-288, PX 84, 86);[26] and (4) Tucker testified that his interview felt like  "a bull in a ring with a script that they were asking questions from a script and then going around the circle . . . . I mean the questions to me seemed scripted to find out information about the lawsuit" (Doc. # 209, at 574).  Although Ruggs articulated legitimate reasons for the decision to withdraw the position, the jury was presented with sufficient evidence to discredit those reasons.

Accordingly, based upon the totality of the evidence presented at trial, and the reasonable inferences that the jury could have deduced from such evidence, sufficient evidence supports the finding that Plaintiff suffered retaliation with respect to his application for rehire.

### D.     Defendant's Rule 59 Motion for New Trial Based upon Clear Weight of the Evidence

It is well settled that "'a less stringent standard applies to a motion for a new trial than to a motion for judgment as a matter of law.'" *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1320 n.3 (11th Cir. 1999) (quoting *Holzapfel v. Town of Newburgh*, 950 F. Supp. 1267, 1272 (S.D.N.Y. 1997)).  As noted earlier, a motion for new trial is due to be granted when "the verdict is against the

---

[25] Although no one could recall exactly when the notice was sent, Ruggs remembered that he had knew of Plaintiff's EEOC charge at the time he helped select who would be on the interview panel. (Doc. # 208, at 261).

[26] For example, one interviewer deleted a seemingly general question, "Where do you want to be five years from now in your career," and in its place substituted, "How many days did you miss from work during the last 12 months other than regularly scheduled vacation, et cetera; how often did you arrive to work late?"  (Doc. # 208, at 328-330, PX 84, 86).  Truman testified extensively about disputes with Tucker over his absences and tardiness, (Doc. # 207, 117-43; Doc. # 208, at 240), and Tucker felt that Truman had treated him harshly with respect to his leave. (Doc. # 209, at 525-49). From this evidence, the jury jury could have concluded that Truman had some input into the questions.

clear weight of the evidence . . . or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984) (internal quotations omitted). "If alternative prayers or motions are presented, as here, . . . the trial judge should rule on the motion for judgment. Whatever his ruling thereon he should also rule on the motion for a new trial, indicating the grounds of his decision." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 253 (1940).

In this case, although Defendant has filed alternative motions pursuant to Rules 50 and 59, its arguments regarding the weight and sufficiency of the evidence are not materially distinguishable. In cases like this, where Defendant's Rule 59 arguments essentially "rehash" its Rule 50 arguments, the Eleventh Circuit has considered the arguments together even though the legal standards differ. *See Dudley*, 166 F.3d at 1320 n.3 ("On liability, [Defendant] contends that it is entitled to a judgment as a matter of law or, in the alternative, to a new trial. . . . The two will be considered together even though the standards are not the same."); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1196 (11th Cir. 2004) ("Concerning the clear weight of the evidence, [defendant] essentially rehashes its arguments to uphold the judgment as a matter of law. These arguments are equally unpersuasive under the new trial motion."); *Walls v. Button Gwinnett Bancorp, Inc.*, 1 F.3d 1198, 1201 (11th Cir. 1993) (same).

Following the procedure set forth by the Eleventh Circuit in a case like this where Defendant's Rule 50 and 59 arguments are merely repetitious, this court finds that even when it weighs the evidence presented at trial and Defendant's arguments (outlined earlier in Section II.D.) against the less stringent Rule 59 standard, it reaches the same result as it did under the Rule 50 standard and is unpersuaded that "the verdict is against the clear weight of the evidence or will result

in a miscarriage of justice." *Hewitt*, 732 F.2d at 1556 (internal quotations omitted).  Accordingly, Defendant's motion for new trial based upon the clear weight of the evidence is due to be denied.

**E.       Defendant's Rule 59 Motion for New Trial Based upon the Propriety of Admission of Certain Evidence**

Defendant has also moved for a new trial on the grounds that the court improperly allowed Plaintiff to present certain evidence to the jury.  Defendant's complaint relates specifically to four categories of evidence admitted at trial: (1) evidence regarding the race of other employees hired by Truman in the Legal Department; (2) evidence regarding the history of Truman's relationship with Plaintiff; (3) evidence to support Plaintiff's alleged "good faith belief" that Truman discriminated against him; and (4) evidence addressing both Defendant's intentions with respect to Plaintiff's application for rehire and Plaintiff's alleged justification for failing to mitigate his damages.   The court will address each type of evidence separately.

**1.       Race of Other Employees Hired By Truman in the Legal Department**

Although Defendant challenges the court's decision to allow testimony concerning the race of persons hired by Truman in the Legal Department, the court finds no error in the admission of this evidence.  Defendant moved *in limine* to preclude Plaintiff from offering evidence that the "majority of employees at the Housing Authority generally or the Legal Department specifically are Black" (Doc. # 174, at 2), and the court granted the motion as it related to any statistical evidence, but denied the motion without prejudice as it related to any evidence regarding the race or gender of any persons hired in the department after Plaintiff was terminated, "anticipat[ing] that during the course of the trial, depending on the evidence presented, a party may ask the court to revisit its

rulings." (Doc. # 182, at 1 n.1).[27]  At trial, the court permitted testimony – prompted by questions posed by counsel for *both* Plaintiff and Defendant– regarding the race of other employees whom Truman hired to work in the Legal Department.  (Doc. # 207, at 106-17; Doc. # 208, at 183-85, 189, 210-14, 221, 234-38, 241).

Defendant now argues, based on Fed. R. Evid. 403, that it was prejudicial for the court to admit "statistical evidence" of the race of employees in the Legal Department without proof of "statistical significance" or elimination of the "most common non-discriminatory explanations." (Doc. # 199, at 24-25) (citing *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299 (1977) and other cases addressing statistical evidence).   While the legal principles mentioned in Defendant's argument are certainly well-established, they unfortunately do not apply to the *non-statistical* evidence admitted in this case. The testimony Defendant challenges was not a percentage breakdown comparing the number of black employees versus white employees in the Legal Department, nor was it presented as a unified listing of the race of each person hired into the Department.  Instead, the evidence of the race of other employees hired by Truman was simply incorporated into chronological presentation of Truman's tenure as head of the Legal Department, which included mention of those employees who worked there during her supervision.  (Doc. # 207, at 106-17; Doc. # 208, at 183-85, 189, 210-14, 221, 234-38, 241).  The court finds no error in the admission of this evidence given its benign presentation.

---

[27] Although Defendant's motion *in limine* also objected to Plaintiff's "[c]omposite exhibit of the names, gender and race of each person hired in the legal department since Tucker's termination" (Doc. # 162, PX95), which the court ruled could be used as a demonstrative aide during trial but was due to be excluded from evidence as a document created for litigation (Doc. # 182), Plaintiff did not rely upon that summary exhibit during trial. Therefore, it is not part of the evidence currently challenged by Defendant.

Moreover, Defendant's argument regarding this category of evidence is somewhat ironic considering that it was Defendant – not Plaintiff – who relied upon the racial composition of the attorneys hired by Truman in its closing argument as evidence that Truman bore no discriminatory animus because she hired both Black and White employees alike.  (Doc. # 210, at 807,[28] *see also* Doc. # 208, at 234-38, 241).  In any event, the court finds that such evidence was certainly relevant to, and probative of, the question of whether Truman bore a discriminatory animus and was not prejudicial to Defendant in the harmless format in which it was presented.

          **2.**        **Historical Evidence of the Relationship Between Truman and Plaintiff**

Defendant also sought *in limine* to prevent Plaintiff from introducing any evidence concerning Truman's strict scrutiny of Plaintiff's time cards and leave requests and Truman's alleged denial to Tucker of access to security codes and passwords – all of which were, at one point in the litigation, the basis for separate "terms and conditions" discrimination claims asserted by Plaintiff.  (Doc. # 174).  Defendant objected to the admission of such evidence on the basis it was not relevant because the court's past summary judgment rulings dismissed those claims as less-than adverse employment actions.  (Docs. # 123, 154).

---

[28] Specifically, Defendant argued to the jury during closing:

> Let's start with Naomi Truman and the legal department.  It has been offered as fact in this case that most of the attorneys in the legal department since Naomi Truman has been general counsel have been white.  That's a fact in the case.  It has been established as a fact in the case that when Barry Tucker applied for work in the legal department, that there were female applicants, that there were black applicants and black female applicants in that applicant pool, but yet Naomi Truman selected him to be hired.  That's a fact.  That's not an inference that we're trying to create from a fact.  That's not a story that we are trying to put together.  That is a fact.

(Doc. # 210, at 807).

Prior to trial, the court preliminarily denied Defendant's request, again noting that either party could ask the court to revisit its ruling during trial. (Doc. # 182). When it became clear at trial that Plaintiff's counsel intended to question Truman regarding those incidents outlined above, the court gave the jury the following limiting instruction:

> Ladies and gentlemen, counsel has informed me that his next line of questioning might relate to some matters that will help inform you about the relationship that the plaintiff had with the defendant during his employment. In this case the plaintiff is only putting before you his discharge claim and the failure to rehire claim. You will hear evidence about other decisions that the plaintiff's counsel takes issue with. Those are not part of this case in terms of the -- of being separate or independent claims, but they may or may not be helpful background information that gives you some sense of the relationship that the plaintiff had at the time of his employment.

(Doc. # 207, at 128-29).

Despite this limiting instruction, Defendant now argues that the "effect of this proof was to give the impression that Truman picked on Plaintiff, and that she was a difficult person to work for, and a micro-manager . . . [allowing Plaintiff to try] the case as a hostile environment case and [] confus[ing] the jury on the issues."  (Doc. # 199, at 28).  To the contrary, the court clearly mitigated any possible prejudice or confusion by instructing the jury that the testimony at issue was relevant only to establish the backdrop for the relationship between Truman and Plaintiff and could not serve as the basis for a separate discrimination claim.  Defendant has not proffered any evidence to suggest that the jury failed to follow this instruction. *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1315-16 (11th Cir. 2001).  The court cannot assume any such failure.  *Id*.

Moreover, Defendant's contention that this evidence may be probative of animus, but not discriminatory animus (Doc. # 199, at 25-27), rings hollow given that Defendant relied upon the very evidence that it now challenges in an effort to show that Truman's employment decisions revealed no discriminatory animus toward Tucker.  (Doc. # 208, at 238-41("Q: He could have been

38

fired for tardiness, couldn't he? A: Yes. Q: He could have been fired for attendance, couldn't he? A: Yes. Q: He could have been fired for not completing his time cards accurately? A: Right. Q: He could have been fired for not having account of his time of where he was? A: Yes. Q: But he never was, was he? A: No, he wasn't."). The court finds no error in the admission of this evidence, which was clearly relevant to establish the prior relationship between Truman and Tucker from which the jury could conclude that discriminatory animus motivated the decision to eliminate Plaintiff's position.

### 3. Testimony from Plaintiff Regarding His Alleged "Good Faith" Belief That Defendant Engaged in Unlawful Employment Practices

Defendant also challenges the admission, with limiting instruction, of Plaintiff's testimony concerning his conversations with Donna Griffin, which were offered by Plaintiff at trial as evidence of his good faith belief that he had been subjected to discrimination prior to the filing of his EEOC Charge. Specifically, Plaintiff testified that he filed his EEOC Charge after Griffin relayed to him that Truman took action against Plaintiff because of his race, attempted to oust Plaintiff, and proposed the reorganization intentionally to target Plaintiff's position for termination. (Doc. # 209, at 559-64).[29] Defendant sought to exclude the evidence both before and during trial on the grounds of both relevancy and hearsay.

With respect to relevancy, contrary to Defendant's assertion that any proof of a good faith belief was "irrelevant" in this case because it was never "challenged" (Doc. # 209, at 556), Eleventh

---

[29] Although Defendant maintains that those conversations with Griffin were not probative of Plaintiff's "good faith belief" because Griffin's *deposition* suggests that those conversations occurred after the filing of his EEOC charge (Doc. # 211, at 26-27), neither party read the deposition into evidence (Doc. # 211, at 27-28) nor offered any other evidence to the jury to question the timing of those conversations. The only evidence presented to the jury on that matter - Plaintiff's testimony - was clear that his conversations with Griffin prompted him to file an EEOC charge. (Doc. # 209, at 564).

Circuit law makes clear that a subjective good faith belief that discrimination has occurred is an *element* of Plaintiff's case for which Plaintiff bears the burden of proof. *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997) ("It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. A plaintiff must not only show that [s]he subjectively (that is, in good faith) believed that [her] employer was engaged in unlawful employment practices, but also that [her] belief was objectively reasonable in light of the facts and record presented."). Neither party stipulated to the existence of a good faith belief (Doc. # 211, at 27-28),[30] and therefore had the court excluded the evidence pursuant to either Rule 401 or Rule 403, the ruling would have unfairly prejudiced the *Plaintiff* by preventing him from meeting his burden on an essential element of his case. Therefore, the court admitted the evidence, but with a limiting instruction to the jury to minimize any confusion or prejudice. (Doc. #209, at 562).[31]

------

[30] Defendant's Rule 50 argument that "[n]ever has the HABD argued, or even indicated that it might argue, that Plaintiff filed his EEOC charge in bad faith" is not helpful at this stage. (Doc. # 199, at 29). It is undisputed that Defendant never stipulated to Plaintiff's good faith belief at any point during the trial. (Doc. # 211, at 27-28).

[31] Defendant's argument that the instruction given by the court likely did not prevent the jury from considering these statements as evidence of Truman's discriminatory and retaliatory animus fails, once again, because Defendant has not provided any evidence to rebut the presumption that the jury will "follow the law as instructed." *Griffin*, 261 F.3d at 1315-16. The court instructed the jury as follows:

> Do you remember during the preliminary instructions in this case I told you that from time to time, I may admit some evidence for a limited purpose, and if I admit evidence for a limited purpose, it must not be considered for other purposes. In this case I have admitted that testimony for a limited purpose. It is not offered by the plaintiff and should not be considered by you as -- to prove the truth of the matter asserted, in other words, to prove that the things said by Mr. Tucker actually were said but rather the effect it had on him. One of the issues in this case has to do with whether Mr. Tucker reasonably filed an EEOC charge, and that is the only purpose the plaintiff is offering this evidence and the only purpose for which I am admitting

Defendant's hearsay objection is likewise without merit.[32]  Although generally "a statement, other than the one made by the declarant while testifying at the trial or hearing," is hearsay if "offered in evidence to prove the truth of the matter asserted,"  Fed. R. Evid. 801(c), such a statement is not hearsay if offered merely to show the effect on the listener.  As the Eleventh Circuit has recognized,

> [a]n "out-of-court utterance must have two characteristics before it is rendered inadmissible as hearsay: It must be a 'statement'- that is a verbal assertion or conduct intended as an assertion, Fed. R. Evid. 801(a)-and it must be offered to prove the truth of the matter it asserts . . . . Thus, excluded from the hearsay rule is verbal or nonverbal 'conduct when it is offered as a basis for inferring something other than the matter asserted.' Consequently, an utterance may be admitted to show the effect it has on a hearer, 4 Weinstein & Berger, *Weinstein's Evidence* ¶ 801(c)[01], at 801-77 (1979). Such verbal acts are not in the first instance assertive statements and not offered to prove the truth of the matter asserted."

*United States v. Cruz*, 805 F.2d 1464, 1477-78 (11th Cir. 1986) (quoting *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250 (5th Cir. 1980)(other citations omitted)). In this case, Plaintiff's testimony regarding Griffin's out-of-court statements was not offered to prove the truth of the matter asserted but merely the effect of those comments on Tucker's belief that he was the

---

> it is that so you can determine and see what effect this -- these alleged statements had on Mr. Tucker. Everybody clear on that? Not offered to prove the truth of the matter asserted but rather to show the effect that the declarant's statements, in other words, Miss Griffin's statements, had on Mr. Tucker. Counsel satisfied with the limiting instruction?  MS. COBIA: Yes, sir. MR. AYERS: Yes, sir. THE COURT: Mr. Haynes?  MR. HAYNES: Yes, sir.

(Doc. # 209, at 562).

[32] It is not insignificant that Defendant listed Griffin on its witness list and had every right to call her as a witness to avoid the hearsay issue entirely. (Doc. # 163). When Defendant's counsel expressed to the court its difficulty in reaching Griffin by telephone, the court offered to extend the trial into the following day to allow Defendant more time to coordinate Griffin's appearance, but Defendant declined the court's offer.  (Doc. # 210, at 769-70).

subject of discrimination.  (Doc. # 209, at 554-64).  Accordingly, the court's admission of this evidence over Defendant's evidentiary challenges was proper.

### 4.    Evidence Tending to Show Defendant's Intentions for Plaintiff's Application for Rehire and a Justification for Plaintiff's Failure to Mitigate

All trial participants agree that the most contested evidentiary issue was the court's decision to admit Defendant's March 20, 2002 Partial Motion to Dismiss (Doc. # 21; PX5) into evidence. The motion filed by Defendant in response to Plaintiff's Amended Complaint, stated that "Plaintiff should not be able to simultaneously seek reinstatement as a remedy and apply for open positions with HABD" and "request[ed] the court to enter an order . . . directing submission of plaintiff to withdraw his application from employment thus submitting his reinstatement claim to the court pending the verdict of the jury vesting all authority over plaintiff in the court."  (Doc. # 209, at 571-72, PX5; Doc. # 21).  For the reasons outlined below, the court finds that admission of the evidence was appropriate.

### i.    Events Leading Up To The Court's Decision to Admit the Motion

As indicated by the court's deliberate actions, outlined below, it cautiously considered the question of whether to admit the motion into evidence.  After Defendant raised an objection to the admission of the motion as part of its pre-trial motion *in limine*  (Doc. # 174), the court held lengthy discussions with counsel regarding the issues underlying the admission of the motion.  The court found Plaintiff's argument persuasive that the motion was probative of at least two issues in the case: (1) evidence of retaliatory intent;[33] and (2) the effect that the motion had on Tucker's alleged

---

[33] Although Defendant now suggests that the motion was the *only* evidence of retaliation presented at trial (Docs. # 199, 206), that is incorrect. Plaintiff presented evidence other than the motion to dismiss from which a jury could have inferred that Defendant retaliated against Plaintiff, including evidence that Ruggs decided to withdraw the position posting only after consulting with Truman,

failure to mitigate by not applying for other positions at HABD.[34]   In addition to the general evidentiary rules governing relevancy (*e.g.,* Fed. R. Evid. 401 and 403), the court's analysis of whether to admit the motion was guided by the following legal principles:

(1) statements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney, *see Lawrence v. Gayle*, 312 So. 2d 385, 387 (Ala. 1975); *Nelson v. Darling Shop of Birmingham, Inc.*, 157 So. 2d 23, 30 (Ala. 1963); *SouthTrust Bank v. Jones, Morrison, Womack & Dearing, P.C.*, 2005 WL 628876, at *16-17 (Ala. Civ. App. 2005); *Mitchum v. Hudgens*, 533 So. 2d 194, 195 (Ala. 1988); *Maner v. Maner*, 189 So. 2d 336, 342 (Ala. 1966); *Blackwell v. Adams*, 467 So. 2d 680, 683-84 (Ala. 1985); Ala. Code § 34-43-21 (1995); *King v. Travelers Ins. Co.*, 513 So. 2d 1023,  (Ala. 1987); *Senn v. Joseph*, 17 So. 543, 544 (Ala. 1895);[35]

(2) the motion, and the statements contained therein, are not hearsay pursuant to Federal Rule of Evidence 801(d)(2), which provides, in relevant part, that a statement is not hearsay if "the statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth." Fed. R. Evid. 801(d)(2); and

(3) a court can appropriately treat statements in court filings, including briefs and motions, as binding admissions of the party, *see Young & Vann Supply*

---

but then later decided to hire a full-time attorney anyway after changing the official title of the position so that it was not the same position for which Plaintiff applied. (*See* discussion Section II.C, *supra*; Doc. # 211, at 32-36).  A jury could have viewed these facts and others as evidence of retaliatory intent.

[34] Tucker received a service copy of the Defendant's motion directly from the court because he had originally filed this lawsuit *pro se* and was listed as an attorney-of-record. (Doc. # 211, at  41-42). The receipt of such a motion that, "request[ed] the court to enter an order . . . directing submission of plaintiff to withdraw his application from employment" (Doc. # 209, at 571-72, PX5; Doc. # 21), arguably had an effect on Tucker's decision not to apply for other positions with Defendant and could be viewed by the jury as partial justification for the failure to mitigate his damages.  (Doc. # 211, at  42; Doc. # 209, at 574-76).

[35] The authority of an attorney to bind his client derives from state law; that the substantive dispute concerns federal law does not matter. *Hayes v. Nat'l Serv. Indus.*, 196 F.3d 1252, 1254 (11th Cir. 1999); *Glazer v. J.C. Bradford & Co.*, 616 F.2d 167, 168 (5th Cir. 1980). *See also Michaud v. Michaud*, 932 F.2d 77, 80 (1st Cir. 1991).

*Co. v. Gulf Florida & Alabama Ry. Co.*, 5 F.2d 421, 423 (5th Cir. 1925); *see also Purgess v. Sharrock*, 33 F.3d 134, 143 (2d Cir. 1994); *City Nat'l Bank v. United States*, 907 F.2d 536, 544 (5th Cir. 1990); *Leslie v. Knight Soda Fountain Co.*, 55 F.2d 224, 225 (2d Cir. 1932).

Based upon these precepts, the court indicated at a pre-trial hearing that it was inclined to admit the motion, but nonetheless would delay the issuance of a final ruling in order to allow the parties time "to submit additional legal authority and argument that might assist the court in making a final ruling." (Doc. # 182).   In the meantime, the court instructed Plaintiff "not to make reference to the Motion to Dismiss during voir dire . . . [and granted] Defendant's oral motion to amend its witness list to add [the lawyer who signed and filed the motion]." (Doc. # 182).

The court's initial ruling prompted Defendant to file a Writ of Mandamus with the Eleventh Circuit, which was denied. (Doc. # 183).  The court even delayed the start of the trial by one extra day to allow the parties yet another opportunity to bring any additional legal authority on this issue to the court's attention.  Neither party did.

Thus, having carefully considered all of these issues, the court admitted the motion at trial over Defendant's objection (Doc. # 209, at 571-72), but only pursuant to very strict guidelines concerning how the motion would be treated: (1) there was to be no mention of the attorney who filed it so that counsel would be called upon to defend only his client - not himself - to the jury, (Doc. # 211, at 31);[36] (2) the exhibit was introduced only through Plaintiff as a witness, and Plaintiff's counsel was not permitted to discuss the exhibit during his examination of any other witness; (Doc. # 211, at  42-43; Doc. # 207, at 62-63); and (3) counsel for both Plaintiff and Defendant could argue to the jury what significance they should draw from that evidence.

_____

[36] Although Defendant suggested at the post-trial hearing on these motions that the court should have redacted the name of attorney who filed the motion, neither party raised that issue at trial. (Doc. # 211, at 31).

44

### ii.      Analysis of Defendant's Challenges to the Admission

Defendant now maintains that for five reasons, "it was impermissible to allow the jury to draw an inference that the HABD intended to retaliate against Plaintiff based upon the arguments asserted by defense counsel in its motion to dismiss [because t]he admission of this evidence severely prejudiced the HABD."  (Doc. # 199, at 28-35).  Specifically, Defendant argues that the court's admission was improper because the motion: (1) invaded the attorney-client privilege; (2) invaded the common law privilege of "litigation immunity;" (3) was not relevant; (4) was inadmissible hearsay; and (5) was an inadmissible pleading.  Many of the Defendant's arguments overlap, so the court will address them comprehensively rather than piecemeal.

As an initial matter, however, the court notes that Defendant's argument that it was "severely prejudiced" when the jury inferred retaliatory intent "based upon" the arguments in the motion to dismiss is flawed from the inception.  As noted in footnote 33 *supra*, the motion to dismiss was only a portion of the evidence offered by Plaintiff in support of his retaliation claim, and the jury could have based its finding of retaliatory intent on all or part of the other evidence of retaliation before it.  Moreover, as a practical matter, the court's decision to allow Plaintiff to offer the motion to dismiss as support for his retaliation claim likely had no impact on the jury's damage award.  As the court concluded earlier, even if Plaintiff had been unsuccessful in convincing the jury that Defendant retaliated against him, the jury likely would have awarded the same back pay and mental anguish damages on Plaintiff's discrimination claim alone.  *See* discussion footnote 23 *supra***.**  Therefore, Defendant's argument that it was "severely prejudiced" by the admission of the motion is severely undermined by the *de minimus* impact that evidence had on the final outcome of the case.

### a.    The Privilege Arguments

Defendant first argues that the court necessarily invaded the attorney-client privilege by admitting into evidence a motion which assumes that a conversation occurred in which Defendant expressed to its attorney a desire for the relief sought by the motion (*i.e.*, to require Plaintiff to withdraw his application for rehire).  (Doc. # 199, at 30).  If Defendant's argument is accepted and extended to its logical conclusion, then courts would impermissibly invade the attorney-client privilege *every time* that a pleading is admitted because the mere filing of that pleading presumes "that there must have been a discussion between the [client] and defense counsel" regarding the relief sought.  (Doc. # 199, at 29).  In fact, *every action* taken by counsel within the scope of his authority as agent for his client presumes that the client authorized the action, but that does not mean that courts prevent attorneys from acting as advocates for their clients because every action that an attorney makes gives the appearance that the client authorized it.[37]  In this case, the court took specific precautions intended to protect the attorney-client privilege as much as possible without preventing admission of probative evidence, including restricting Plaintiff's counsel to introducing the evidence through Plaintiff alone and preventing Plaintiff from examining any other witness about the motion. (Doc. # 211, at 31, 42-43; Doc. # 207, at 62-63).   The court finds no logical basis to have excluded the evidence because of either an express or implied invasion of the attorney-client privilege.

Moreover, there is no precedent or logic behind applying a common law "litigation privilege" in this case.  Such a privilege was created by Alabama state courts solely to prevent suits

---

[37]The court is baffled by Defendant's bald assertion that the court "conceded" that the attorney-client privilege was invaded because the filing of the motion presumes that an attorney-client conversation preceded that filing.  (Doc. # 199, at 30).  The court did nothing of the sort.

for libel and defamation based upon statements made during litigation, *Aetna Casualty & Surety Co. v. Mitchell Brothers, Inc.*, 814 So. 2d 191, 198 (Ala. 2001), and the courts have limited the application of the privilege to libel and slander suits.  *See e.g., Walker v. Majors,* 496 So. 2d 726 (Ala. 1986).   But even if the privilege could apply outside of the context of defamation lawsuits, this is not a case where Defendant "[was] sued for what is said during the course of litigation." *Aetna*, 814 So. 2d at 198.   Plaintiff's retaliation claim was not the result of statements made by Defendant in its partial motion to dismiss – Plaintiff's Amended Complaint alleging retaliation was filed *before* the motion at issue.   Moreover, even if the jury found the motion was evidence of retaliatory intent, as noted earlier, that was not the only evidence of that type.   The jury was presented with other independent evidence of retaliation in addition to the motion.

Finally, the court notes that Defendant's privilege arguments run contrary to clear authority, under Alabama law, that admissions by an attorney concerning a matter within his employment typically bind his client without *any evidence* of whether the client actually authorized the admission.[38]   *See Lawrence v. Gayle*, 312 So. 2d 385, 387 (Ala. 1975) ("[O]missions and commissions of an attorney at law are to be regarded as acts of the client whom he represents."); *Nelson v. Darling Shop of Birmingham, Inc.*, 157 So. 2d 23, 30 (Ala. 1963); *SouthTrust Bank v. Jones, Morrison, Womack & Dearing, P.C.*, 2005 WL 628876, at *16-17 (Ala. Civ. App. 2005)(citing Restatement (Second) of Agency § 2 (1958)("[A]n attorney is the duly authorized agent of his client and his acts are those of his client. The client is, therefore, bound by the acts of his attorney in the course of legal proceedings in the absence of fraud or collusion, and knowledge of

---

[38] As noted earlier, the authority of an attorney to bind his client derives from state law. *Hayes v. Nat'l Serv. Indus.*, 196 F.3d 1252, 1254 (11th Cir. 1999); *Glazer v. J.C. Bradford & Co.*, 616 F.2d 167, 168 (5th Cir. 1980). *See also Michaud v. Michaud*, 932 F.2d 77, 80 (1st Cir. 1991).

the attorney is imputed to the client, notwithstanding the client had no actual knowledge or notice of the facts and circumstances.")); *Mitchum v. Hudgens*, 533 So. 2d 194, 195 (Ala. 1988)(holding that an attorney is a special agent for his client during the prosecution or defense of his client's case). Under Alabama law, an "attorney of record . . . is [] presumed to have authority to bind his client." *Maner v. Maner*, 189 So. 2d 336, 342 (Ala. 1966).  As the Alabama Supreme Court has pronounced: "Since 1852, the following statute has expressed the law in this state: 'An attorney has authority to bind his client, in any action or proceeding, by any agreement in relation to such case, made in writing, or by an entry to be made on the minutes of the court.'" *Blackwell v. Adams*, 467 So. 2d 680, 683-84 (Ala. 1985) (quoting Ala. Code § 34-43-21(1975)). "[This statute] vests in an attorney authority to bind his or her client in **all matters** that relate to the cause." *King v. Travelers Ins. Co.*, 513 So. 2d 1023, 1026 (Ala. 1987)(emphasis added); *see also Senn v. Joseph*, 17 So. 543, 544 (1895) ("We do not think the effect of this statute is to invest the attorney with power over the entire cause equal to that of his client, but to invest him with authority to bind his client in all matters which relate to the prosecution or defense of the rights of his client.").

The cloak of privilege cannot shield a client from responsibility for the acts and statements of an agent acting within his authority.  In fact, given that the "knowledge of the attorney is imputed to the client, notwithstanding the client had no actual knowledge or notice of the facts and circumstances," *SouthTrust Bank*, 2005 WL 628876 at *16-17 (quoting *Ex parte Aaron*, 155 So. 2d 334, 335 (Ala. 1965), the issue of whether an actual conversation took place between attorney and client concerning the filing of the motion at issue is simply not relevant under Alabama law.  We presume that the attorney had the authority to file that motion, and therefore there is simply no reason why either the attorney-client privilege or the litigation common law privilege prevented the admission of the motion to dismiss in this case.

48

### b.       The Admissibility Arguments

The court is equally unpersuaded by Defendant's arguments that admission of the motion runs afoul of certain Federal Rules of Evidence.  Relying on cases from Alabama state courts, Defendant maintains that the motion was not relevant under Fed. R. Evid. 401 because "[t]here is no legal authority which allows a jury to infer the intent of a party from an unsworn motion signed by the attorney on behalf of that party." (Doc. # 199, at 33-35).  Defendant also relies on Alabama state law as support for his argument that the statements contained in the motion are inadmissible hearsay that fail to qualify as "non-hearsay" admissions of a party-opponent under Fed. R. Civ. P. 801(d)(2).

Defendant's arguments are flawed in the first instance because they rely on the wrong body of law.  Although the question of an attorney's authority to bind his client is determined by the agency law of the state in which the federal district court sits, *Hayes*, 196 F.3d at 1254; *Glazer*, 616 F.2d at 168, the procedural question of whether those attorney statements are properly admitted into evidence as non-hearsay party admissions is a question for federal law.  *See Fidelity & Cas. Co. of New York v. Funel*, 383 F.2d 42 (5th Cir. 1967)(summarized in footnote 39 *infra*); *Borden, Inc. v. Florida East Coast Ry. Co.*, 772 F.2d 750, 754 (11th Cir. 1985)("[T]he admissibility of evidence in federal courts is governed by federal law.").  Therefore, Defendant's reliance on state law for the proposition that the motion in this case is inadmissible hearsay because "[a]n unsworn pleading signed only by the attorney is not generally an admission of a party" is inapposite. (Doc. # 199, at 36)(citing *Murphree v. Henson*, 267 So. 2d 414 (1972)).[39]

---

[39] In fact, the former Fifth Circuit previously rejected a defendant's reliance on state law under similar facts.  In *Fidelity & Cas. Co. of New York v. Funel*, 383 F.2d 42 (5th Cir. 1967), the defendant/appellant argued that state agency law governs not only the authority of the agent, but also the admissibility of the out-of-court statement as a non-hearsay admission against party interest.

When the court applies the federal law of this Circuit to the question of admissibility of court filings as evidentiary admissions, it is clear that this court can appropriately treat even unsworn statements in motions and briefs as binding admissions. *Young & Vann Supply Co. v. Gulf Florida & Alabama Ry. Co.*, 5 F.2d 421, 423 (5th Cir. 1925) (citing *Oscanyan v. Arms Co.*, 103 U.S. 261 (1880) and finding "[w]e may consider the statements in the brief as admissions of facts."); *see also City Nat'l. Bank v. United States*, 907 F.2d 536, 544 (5th Cir. 1990) (citing *Young* as support for their observation that "[w]e can appropriately treat statements in briefs as binding judicial admissions of fact"); *Purgess v. Sharrock*, 33 F.3d 134, 143 (2d Cir. 1994); *Leslie v. Knight Soda*

---

*Funel,* 383 F.2d at 44. The court rejected this contention, noting:

> "The defendant contends here that [state] law governs the admissibility of admissibility of this evidence, because the question is really one of agency rather than of evidence. We disagree. This Court has taken the position that [federal rules] govern[] the admissibility of evidence in federal courts, and [] should be interpreted to favor the admissibility of the evidence . . . . The Supreme Court's decision in *Hanna v. Plumer*, 380 U.S. 460 (1965), supports our conclusion that federal law rather than state law should govern. *See also* the excellent discussion in Comment, Federal Rule 43(a): The Scope of Admissibility of Evidence and the Implications of the Erie Doctrine, 62 Colum. L. Rev. 1049 (1962)."

*Funel,* 383 F.2d at 44 n.3.

In any event, even if state law governed this dispute (and it does not), *Murphree v. Henson*, 267 So. 2d 414 (1972), and the cases that it cites, are distinguishable because they considered the question of whether unsworn pleadings from one lawsuit may be admitted as admissions of that same party in another lawsuit. That is not the case here. Moreover, *Murphree*'s observation that "[u]nsworn pleadings . . . are ordinarily not admissible as admissions, unless it be shown by independent evidence that the pleadings were drawn under the authority of the party in whose name the pleading is filed," must be read in conjunction with the Alabama Supreme Court's clear and consistent holding that we **presume that an attorney has the authority to bind his client in all aspects of the representation unless evidence proves otherwise**. *See Maner,* 189 So. 2d at 342; *Blackwell*, 467 So. 2d at 683-84; Ala. Code § 34-43-21 (1975); *King*, 513 So. 2d at 1026; *Senn*, 17 So. at 544. To the extent *Murphree* departs from that longstanding body of law, it is not binding. In any event, in this case, neither party has argued that counsel for Defendant was not acting in an authorized capacity when he filed the motion at issue, and there is no evidence to suggest that defense counsel lacked the authority to bind his client when he filed, under Rule 11 and possible penalty of sanctions, the motion in question.

*Fountain Co.*, 55 F.2d 224, 225 (2d Cir. 1932).[40]  The fact that the statements at issue in this case

were within a *motion*, as opposed to a sworn pleading, makes no difference.[41]  *Cf. Cont'l Ins. Co.*

*of New York v. Sherman*, 439 F.2d 1294, 1798 (5th Cir. 1971)(admitting statements in a sworn

pleading as judicial admissions) *and Young*, 5 F.2d at 423 (admitting unsworn statements in a brief

as judicial admissions).  Therefore, the court finds no merit in Defendant's argument that the court

lacked "legal authority" for its decision to admit the evidence as relevant under Rule 401[42]  to at

least two issues in the case and to allow the "jury to infer the intent of [Defendant] from an unsworn

motion signed by the attorney on [its] behalf."  (Doc. # 199, at 34).

As the cases outlined above also provide, the statements contained in the motion fall outside

of the definition of hearsay because they are admissions of a party-opponent, and therefore Rule 801

_____

[40] Both the Fifth Circuit and the Second Circuit have interpreted *Young* to permit a court to treat statements in briefs not merely as refutable evidentiary admissions, but as binding *judicial* admissions, which are conclusively established for the jury.  *See Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc.,* 713 F.2d 618, 621 (11th Cir. 1983)("'[J]udicial admissions are proof possessing the highest possible probative value.  Indeed, facts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them.'").   The court did not go that far in this case, admitting the statements in Defendant's motion not as judicial admissions, but as mere evidentiary admissions that Defendant was free to rebut with other evidence and from which the jury could draw its own inferences.  (Doc. # 209, at 571-72).  Thus, the court permitted the jury to decide for themselves what weight should be given to the statements in Defendant's motion.

[41] The court notes that Defendant's brief at least does not dispute that, under federal law, relevant *sworn pleadings* can be admissible as judicial admissions against the pleading party.  (Doc. # 199, at 35) (recognizing the authority of *Cont'l Ins. Co. of New York v. Sherman*, 439 F.2d 1294, 1798 (5th Cir. 1971)).

[42] Defendant does not explicitly argue that, pursuant to Fed. R. Evid. 403, the court improperly balanced the probative value of the motion against any unfair prejudice of its admission.  In any event, such an argument lacks merit because the potential probative value of the motion to two crucial issues in the case – retaliatory intent and Tucker's alleged failure to mitigate – far outweighs any prejudice, especially given the court's strict guidelines for admitting the motion (outlined on page 44 *supra*) which were specifically tailored to minimize any prejudice to Defendant.

did not prevent their admission.  Defendant's contention that the motion contained only "arguments" or "opinions" that were not properly categorized as admissions (Doc. # 199, at 33-34), simply is not consistent with the definition of a party admission in Rule 801.  Rule 801(d)(2) requires only that a party admission be a "statement," which is defined as: "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion."  Fed. R. Evid. 801(a). In this case, the motion certainly makes statements on behalf of Defendant.  (Doc. # 209, at 571-72, PX5; Doc. # 21) ("Plaintiff should not be able to simultaneously seek reinstatement as a remedy and apply for open positions with HABD" and "the court  [should] enter an order . . . directing submission of plaintiff to withdraw his application from employment.")  The jury could draw their own inferences from these statements.   Thus, Defendant's contention that the motion was improperly admitted hearsay because it contains no "facts" that were admissions is simply off the mark.

As outlined above, the court's decision to admit the partial motion to dismiss as potentially probative of both retaliatory intent and Tucker's alleged failure to mitigate was carefully considered, guided by sound legal principles applicable to the issues raised by admission of the motion, and specifically tailored to minimize prejudice and maximize the jury's prerogative to weigh the evidence before it.  The court can find no justification for a new trial on the basis of the admission of that evidence.

### F.    Defendant's Motion for New Trial or Remittitur Based Upon Excessiveness of Compensatory Damages

Finally, Defendant challenges the jury's damages award by arguing: (1) the jury's mental anguish award was against the great weight of the evidence; and (2) the jury's back pay award was unfair both because Defendant was not given a full and fair opportunity to investigate Plaintiff's

back pay calculations and because the jury failed to take into account Plaintiff's failure to mitigate. The court is not persuaded by either argument.

### 1.      Mental Anguish Damages

As articulated earlier, the court is "particularly deferential . . . to the fact finder's determination of compensatory damage awards for intangible, emotional harms because the harm is so 'subjective and evaluating it depends considerably on the demeanor of the witnesses.'" *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1315 (11th Cir. 2001) (quoting *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir. 1999)); *see also Bogle v. McClure*, 332 F.3d 1347, 1359 (11th Cir. 2003). As the Eleventh Circuit has held, "general compensatory damages, as opposed to special damages, need not be proven with a high degree of specificity." *Ferrill*, 168 F.3d at 476.  In fact, this Circuit has repeatedly noted that "damages for emotional distress . . . 'may be inferred from the circumstances as well as proved by the testimony.'" *Marable v. Walker*, 704 F.2d 1219, 1220 (11th Cir. 1983) (quoting *Gore v. Turner*, 563 F.2d 159, 164 (5th Cir. 1977) and holding that plaintiff's own testimony that he was embarrassed and humiliated by defendant's conduct was sufficient to support compensatory damages award), *cited with approval in Akouri v. Florida DOT*, 408 F.3d 1338, 1345 (11th Cir. 2005) and *Ferrill*, 168 F.3d at 476.

Defendant has suggested that the law of this Circuit now requires "proof [of nine factors] [] to establish mental anguish damages in a case of this kind . . . . [including:] (1) whether plaintiff lost the esteem of his peers; (2) whether plaintiff suffered physical injury as a consequence of his emotional distress; (3) whether plaintiff received psychological counseling or other medical treatment; (4) whether the plaintiff suffered a loss of income; (5) the degree of emotional distress; (6) the context of the events surrounding the emotional distress; (7) the evidence tending to corroborate the plaintiff's testimony; (8) the nexus between the challenged conduct and the

emotional distress; and (9) any mitigating circumstances." (Doc. # 199, at 38) (citing *Akouri v. Florida DOT*, 408 F.3d 1338 (11th Cir. 2005)).  That is simply not the law as established by *Akouri*.

In *Akouri*, after a jury verdict for Plaintiff on his Title VII failure to promote claim, the court entered judgment notwithstanding the verdict, which reduced the jury's compensatory damage award of $552,000 for emotional pain and mental anguish to nominal damages.  *Akouri*, 408 F.3d at 1342.  The Eleventh Circuit affirmed, finding that Plaintiff made "no attempt to describe any kind of harm, mental, emotional, or otherwise, arising from the discrimination," and instead argued only that the jury could have inferred from his demeanor while testifying at trial that he suffered emotional harm and mental anguish.  *Akouri*, 408 F.3d at 1345.  The court concluded that such ephemeral evidence was not sufficient to support the jury's compensatory damages award, agreeing with a Fourth Circuit decision that "'the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award for compensatory damages.'"  *Akouri*, 408 F.3d at 1345 (quoting *Price v. City of Charlotte*, 93 F.3d 1241, 1254 (4th Cir. 1996)).

Although the *Akouri* decision did refer in a footnote to nine factors employed by the Fourth Circuit in *Price* to "aid" its review of sufficiency challenges to emotional distress damage awards (hereinafter the "nine *Price* factors"), the Eleventh Circuit did not actually apply the factors in *Akouri* because it found that "Akouri failed to show any evidence regarding emotional distress." *Akouri*, 408 F.3d at 1345 n.5.  At best, the nine *Price* factors are dicta, which "is not binding on anyone for any purpose." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1314-15 (11th Cir. 1998) (Carnes, J., concurring specially).  Moreover, this Circuit has established that at least some of the nine *Price* factors, including "evidence of pecuniary loss, psychiatric disturbance, effect on social

activity, or physical symptoms . . . go more to the amount, rather than the fact, of damage. That the amount of damages is incapable of exact measurement does not bar recovery for the harm suffered." *Marable*, 704 F.2d at 1220.  Accordingly, this court is not bound to apply the *Price* factors to this case.

In any event, this case is distinguishable from *Akouri*.  In this case, Plaintiff's testimony was not devoid of evidence of emotional distress, nor comprised solely of "conclusory statements that the plaintiff suffered emotional distress."  *Akouri*, 408 F.3d at 1345 (quotations omitted).  In fact, Plaintiff's distress was "sufficiently articulated" in that Plaintiff testified extensively regarding his inability to sleep at night, his stomach problems, the counseling he sought from his pastor, the embarrassment he suffered, the humiliation of pretending to go to work so that his children would not know he had lost his job, his need to modify his spending habits due to financial difficulty, the loss to his self-esteem, his feelings of anxiety, and his bouts of crying. (Doc. # 209, at 590-595). Although Defendant argues that Plaintiff's testimony also revealed the existence of other stressful events unrelated to his termination that could have led to his physical symptoms, including increased alcohol consumption and marital problems (Doc. # 199, at 36-37; Doc. # 209, at 619-26),  those were factors for the jury to weigh against the other testimony presented.  That is not the job of this court, nor is it a proper attack on the jury's award.

Accordingly, the court finds that the testimony presented at trial sufficiently established that Plaintiff suffered demonstrable emotional distress such that a reasonable jury could conclude that Plaintiff was entitled to $100,000 in emotional distress damages.[43]

---

[43] Relying on the nine *Price* factors, Defendant makes much of the fact that Plaintiff presented no medical testimony, no corroborating witness testimony, and no documentary evidence of financial distress to support his claim of emotional distress.  (Doc. # 199, at 36-37).  Although the court has already determined that it is not bound to apply the *Price* factors, the court finds that a balancing of

### 2. Back Pay

Defendant's primary argument for new trial or remittitur of the jury's back pay award is not based upon the evidence before the jury – but rather on what was *not* presented to the jury. Defendant maintains that a new trial is warranted because it was denied the opportunity to conduct full and fair discovery on Plaintiff's back pay calculations.  (Doc. # 199, at 39).  Defendant contends: "Plaintiff's blatant disregard for the discovery process, and Defendant's resultant inability to show the true extent to which Plaintiff either mitigated his damages or unreasonably failed to do so, should not have been rewarded with a generous back pay award."  (Doc. # 206, at 11).

To the contrary, the court gave Defendant a wide berth to discover information relevant to damages and mitigation and finds no grounds for a new trial on this issue. After this lawsuit was filed in August 2001, extensive discovery was conducted by the parties, including the deposition of Plaintiff, before the court took dispositive motions under submission in July 2004.  (*See* Docs. 1-122).[44]  After remand from the Eleventh Circuit on the issue of qualified immunity, the parties represented that "[n]o further discovery is requested" (Doc. # 148), and the court entered a revised Scheduling Order indicating that discovery was closed.  (Doc. # 149).  Nonetheless, Defendant continued to request, and Plaintiff continued to provide, his state and federal tax returns as they became available.  At the pretrial conference on December 6, 2005, the court reopened discovery

---

those factors nonetheless would support the jury's emotional distress award in this case.  As noted above, Plaintiff testified that he: (1) lost the esteem of his/her peers; (2) suffered stomach problems as a result of the stress; (3) sought counseling from his pastor; (4) suffered a loss of income; (5) endured a great degree of humiliation and embarrassment; and (6) lied to his friends and family to cover up his unemployment.  (Doc. # 209, at 590-595). The court finds that even under the *Price* factors, the jury's award in this case must stand.

[44] In fact, this court delayed consideration of dispositive motions on two different occasions to allow more time for discovery. (Docs. # 54, 80-82).

for the limited purpose of conducting refresher depositions on the issues of damages and mitigation. (Doc. # 160).  On January 20, 2006, eleven days before the case was scheduled for trial, Plaintiff was deposed for over four hours in his "refresher deposition" before Plaintiff's counsel stopped the questioning and requested court intervention.  In response, this court[45] ordered that Defendant could continue deposing Plaintiff for one more hour provided that Plaintiff first retrieved responsive documents from his office that had not yet been produced.  Plaintiff complied, and the deposition continued.  The following week, Plaintiff also produced approximately 400 additional documents related to his law practice income.

Defendant admits that prior to trial, Plaintiff produced his state and federal returns for all of the requested years in addition to approximately 400 pages of financial information related to his law practice income  (Doc. # 199, at 38-39), which appears to satisfy the discovery requests at issue.[46]  Defendant has not told the court what documents, if any, it still seeks, opting instead to focus on the timing of Plaintiff's production and the organization (or lack thereof) of the documents produced.  (Doc. # 199, at 42) (they "were mostly illegible, were unorganized, and [] contained no ledger of any sort indicating fees received from clients in his private law practice for years 2001 to 2005").  Although the court agrees that Plaintiff could have produced more financial information

---

[45] Judge Hancock of this court assisted the undersigned (who was out of the district) by hearing the parties' arguments and resolving the disputes between them.

[46] Defendant requested the following financial information from Plaintiff: (1) Plaintiff's 2004, 2003, 2002, and 2001 state tax Form 40, Form W2, Form 1099, and equivalent filings; (2) Plaintiff's 2004 federal income tax form 1040, Form 40, Form W2, Form 1099 and equivalent filings; and (3) any and all ledgers or other documents which reflect practice income from January 2001 to the present date, including K-1, business returns, schedules for the business, gross and net business income for each year and gross and net individual income for each year.  (Doc. # 199, at 37-38).

earlier in the case, it finds no prejudice to Defendant given that it appears that all of the requested information was produced sufficiently in advance of trial to permit Defendant to prepare its case.

The court likewise finds that a new trial is not warranted simply because Plaintiff produced 400 pages of information related to his law practice income that were not tabbed and color-coded for ease of reference. Rule 34 requires only that documents be produced "as they are kept in the usual course of business or [] organize[d] and label[ed] [] to correspond with the categories in the request." Fed. R. Civ. P. 34(b). Defendant admits that Plaintiff is self-employed and Plaintiff readily concedes that he does not keep accurate books of his receipts. (Doc. # 199, at 40). Therefore, "it is entirely possible that Plaintiff, an individual without the benefit of a sophisticated entity-wide filing system, actually stores these documents in the manner served, and therefore, he did produce them as he ordinarily keeps them." *Beckwith v. Robert Bosch Fuel Sys. Corp.*, 2005 WL 2571850, at *2 (W.D. Mich. 2005). That is all that Rule 34(b) requires.

Defendant's alternative argument, that the jury's back pay award should be reduced based upon the failure to mitigate, puzzles the court. (Doc. # 199, at 43 ("Additionally, the undisputed evidence presented at trial shows that Plaintiff did not seek employment from some of the most obvious places that he should have pursued . . . . This alone should serve to show that Plaintiff failed to mitigate his damages, and that the jury's damages award should be reduced.")). The court *agrees* that sufficient evidence was presented to permit the trier of fact to question whether Plaintiff mitigated his damages (Doc. # 209, at 564-584; 614-18, 637-39; Doc. # 210, at 675-686), and notes that, with the exception of a few odd dollars, the jury's $93,990.38 back pay award approximates two years of back pay – not the $184,644.50 requested by Plaintiff for the five year period from the

point of termination to the date of verdict.[47]   Although  "[b]ack pay is 'the difference between the

actual wages earned and the wages the individual would have earned in the position that, but for the

discrimination, the individual would have attained . . . . unrealistic exactitude is not required' as the

back-pay calculation may be based on 'just and reasonable inference' of the missing or imprecise

figure."  *Akouri,* 408 F.3d at 1343 (internal citations omitted).   Thus, despite the fact that the

numbers are not exactly precise,[48] the parties agree that the  "logical presumption" is that the jury's

---

[47] The jury was issued the following back pay charge, in pertinent part:

> Lost wages, also referred to as back pay, is the amount that the plaintiff would have
> earned in his employment with defendant if he had remained employed or been
> reemployed after his application . . . . If you find for the plaintiff on both the
> discrimination or retaliation claims, he cannot recover a double back pay award for
> the same period of time, so you should calculate his lost wages from the earlier date,
> the date of his discharge up to the date you render your verdict.

(Doc. # 210, at 791-92).  The jury also was instructed to reduce the amount of damages if it found
that Plaintiff failed to mitigate those damages:

> So if you should find from a preponderance of the evidence that the defendant has
> proven that the plaintiff failed to seek out or take advantage of a business or
> employment opportunity that was reasonably available under all the circumstances
> shown by the evidence and substantially equivalent to plaintiff's prior employment,
> then you should reduce the amount of the plaintiff's damages by the amount that
> could have been reasonably realized if the plaintiff had taken advantage of such
> opportunity.

(Doc. # 210, at 791).

[48] The jury's back pay award was $93,990.38, which is $15.98 more than what Plaintiff would have
earned in two years at $46,987.20, which was presented to the jury as the rate of his salary when his
position was terminated. (PX 40, PX50)). Both parties recognize that the jury's back pay calculation
could have taken into account a number of different variables which would explain the $15.98
difference. Although Plaintiff's ending salary without benefits was $46,987.20 (PX40, PX50),
Plaintiff also presented evidence of his ending salary with benefits ($55,029.84) and he projected
an annual growth rate of 4.5% for his future earnings.  (PX40, PX50).  Moreover, at trial defense
counsel called into question whether the tax returns indicating Plaintiff's salary figures were
properly "supported by records and receipts that would confirm absolutely the figures that you have
in your tax returns," (Doc. # 210, at 727). Even Plaintiff admitted that some of the figures on his

back pay award likely *was* reduced for failure to mitigate.  (Doc. # 211, at 49, 54-55; Doc. # 204, at 6-7).  *See Reiner v. Family Ford, Inc.*  146 F. Supp. 2d 1279, 1286-87 (M.D. Fla. 2001) (finding that, in the absence of a specific jury interrogatory, a back pay award for less than the amount requested creates an inference that the jury believed that plaintiff did not fully mitigate damages).  The court finds no basis to reduce the award further.

## III.   Plaintiff's Requests for Equitable Relief

Plaintiff requests that this court award him equitable relief in the form of reinstatement to a legal position at HABD, or in the alternative, front pay.  (Doc. # 194).  Plaintiff also requests an award of prejudgment interest on the jury's back pay damage award.  The decision to award equitable relief is within the discretion of the trial court, *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1448 (11th Cir. 1985), provided that it is "guided by sound legal principles," *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416 (1975).  The court has determined that both front pay and prejudgment interest are appropriate in this case.  The following is a "careful[] articulat[ion] of [the] rationale" behind this decision.  *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1563 (11th Cir. 1988) (citations omitted).

### A.   Reinstatement

"In addition to back pay, prevailing Title VII plaintiffs are presumptively entitled to either reinstatement or front pay." *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1528 (11th Cir.1991).

---

back pay calculations sheet were merely good faith "estimates."  (Doc. # 210, at 730).  Thus, the jury could have taken into account any of those variables when calculating its back pay award that appears to be a few dollars off.  In the end, while several mathematical calculations may be plausible explanations of what took place in the jury room,  (Doc. # 211, at 22-23; 57-59),  neither the court nor counsel was privy to those discussions and therefore any effort to decode the jury's back pay award is mere speculation.  The jury could have simply made a calculation error that resulted in the $15.98 difference.  Nonetheless, unreasonable exactitude is not required.

The Eleventh Circuit has observed that "reinstatement offers the most likely means of making a plaintiff whole by allowing [him] to continue [his] career as if the discrimination had not occurred." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1338 (11th Cir. 1999) (citing *Allen v. Autauga County Bd. of Educ.*, 685 F.2d 1302, 1305-06 (11th Cir.1982)). Thus, this Circuit follows a rule of "'presumptive reinstatement' in wrongful discharge cases" for victorious plaintiffs, absent special circumstances warranting the denial of equitable relief. *Farley*, 197 F.3d at 1338 (quoting *Williams v. Roberts*, 904 F.2d 634, 639 (11th Cir.1990) and citing *Williams v. City of Valdosta*, 689 F.2d 964, 977 (11th Cir.1982)). Nonetheless, reinstatement is not always required. In situations where "discord and antagonism between the parties would render reinstatement ineffective as a make-whole remedy," a court may consider an award of front pay in lieu of reinstatement. *Goldstein v. Manhattan Industries, Inc.,* 758 F.2d 1435, 1449 (11th Cir. 1985).

In this case, the court finds that reinstatement is inappropriate. First, Defendant has represented, and Plaintiff has not challenged, that no Assistant General Counsel or other comparable position currently is available at HABD. This court agrees with other courts that have found reinstatement (or instatement, for that matter) inappropriate in situations where there is no vacancy in which to place the plaintiff or where an incumbent employee must be discharged to accomplish the reinstatement. *See, e.g.*, *Williams v. Pharmacia, Inc.,* 137 F.3d 944, 951 (7th Cir. 1998); *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 257 (5th Cir. 1995); *La Fleur v. Wallace State Community College*, 955 F.Supp. 1406, 1426 (M.D. Ala. 1996).

Although Plaintiff also has asked the court to order Defendant to consider him for any *future* available legal positions at HABD, the court finds that remedy inappropriate for another reason. It is clear in this case that "discord and antagonism between the parties would render reinstatement ineffective as a make-whole remedy." *Goldstein*, 758 F.2d at 1449. The testimony at trial revealed

61

persistent antagonism between Plaintiff and Truman (Doc. # 207, at 135-37; Doc. # 209, at 525-49), who is no longer head of the legal department at HABD, but nonetheless would still supervise Plaintiff if he were rehired at HABD.  (March 29, 2006 Hearing Transcript at 46-47; Doc. # 207, at 105-06; Doc. # 208, at 289).   Whatever discord existed before trial could only have been exacerbated by the accusations made by both sides during trial testimony.   Thus, the court finds that the antagonism between Plaintiff and Truman in this case goes beyond mere "'hostility common to litigation,'" *E.E.O.C. v. Century Broadcasting Corp.,* 957 F.2d 1446, 1462 (7th Cir. 1992), *cited in Farley*, 197 F.3d at 1338, thereby rendering reinstatement inappropriate.

    **B.**    **Front Pay**

    In the alternative, Plaintiff has requested that the court award him front pay. Although the Eleventh Circuit has previously stated that "prevailing Title VII plaintiffs are presumptively entitled to either reinstatement or front pay," *Weaver*, 922 F.2d at 1528; *E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 619 (11th Cir. 2000), it has held in other cases brought under the Age Discrimination in Employment Act ("ADEA"), that "because of the potential for windfall, the use of front pay must be tempered," *Lewis v. Federal Prison Industries, Inc.*, 953 F.2d 1277, 1281 (11th Cir. 1992), is a special remedy to be awarded in "extenuating circumstances," *Farley*, 197 F.3d at 1339, and is "warranted only by egregious circumstances," *Eskra v. Provident Life and Acc. Ins. Co.*, 125 F.3d 1406, 1417 (11th Cir. 1997) (citations omitted).   In this case, which standard applies is outcome determinative – use of the "presumptive entitlement" standard would result in an award of front pay for Plaintiff, while application of the "egregiousness" standard would not.[49]  Given that this is a Title

---

[49]  In this case, Plaintiff admits that the only evidence of "egregious" behavior is the jury's finding that HABD initially terminated Plaintiff, and then retaliated against him by failing to rehire him. (March 29, 2006 Hearing Transcript at 53).   This court is not convinced that the "egregious" requirement is satisfied merely because a jury found that retaliation occurred.   *See Reiner v. Family*

VII case,[50] the court will apply the controlling precedent of the Eleventh Circuit in Title VII cases and will presume that Plaintiff is "presumptively entitled" to front pay without a required showing of "egregious circumstances."

As with back pay, "[t]he duty to mitigate damages by seeking employment elsewhere will, of course, limit the amount of front pay available." *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1552 (11th Cir. 1988). "The award of 'front pay' covers monetary damages for future economic loss (future wages) until the age of retirement; the amount of damages recovered may be mitigated by claimant's new employment or claimant's unreasonable refusal of reinstatement." *Lewis*, 953 F.2d at 1282 n.2 (Tjoflat, J. dissenting in part) (citing *Wilson v. S & L Acquisition Co.*, 940 F.2d 1429, 1433 n.6, 1434 (11th Cir. 1991)). In other words, a monetary award of front pay is calculated to end on the date the discrimination victim attains the position he would have been in but for the

_____

*Ford, Inc.* 146 F. Supp. 2d 1279, 1286-87 (M.D. Fla. 2001) (finding in a retaliatory discharge case that termination was not result of egregious circumstances). Punitive damages were not at issue in this case because HABD is a public entity, and the jury was not presented with an interrogatory specifically addressed to the issue of reckless disregard. *Compare Reiner*, 146 F. Supp. 2d at 1289 ("When asked whether it found 'from a preponderance of the evidence that a higher management official of [Defendant] acted with malice or reckless indifference to [Plaintiff's] federally and/or state protected rights[,]' the jury responded in the negative.") Therefore, other than the mere act of retaliation, Plaintiff has presented no evidence that HABD acted with "reckless disregard" toward Plaintiff, *see Eskra*, 125 F.3d at 1417-18, or that other egregious circumstances warrant an award of front pay.

[50] As the Supreme Court has recognized, while there are "important similarities" between Title VII and the ADEA in their aims and in their substantive prohibitions, there are "significant differences" in the remedial and procedural provisions of the two statutes. *Lorillard v. Pons*, 434 U.S. 575, 579 (1978). Remedies under the ADEA are modeled after the Fair Labor Standards Act, not 42 U.S.C. § 1981a. *See* 29 U.S.C. § 626(b). *But see Reiner v. Family Ford, Inc.*, 146 F. Supp. 2d 1279, 1288-89 (M.D. Fla. 2001)(adhering to the "egregious circumstances" standard in a Title VII case and citing *Stanfield v. Answering Service, Inc.*, 867 F.2d 1290, 1296 (11th Cir. 1989) wherein the Eleventh Circuit cited to a case addressing the duty to mitigate damages under Title VII as an "instructive guide" in interpreting the same duty under the ADEA)); *Maleszewski v. United States*, 827 F. Supp. 1553, 1556 (N.D. Fla. 1993) ("[T]he relief available to a successful ADEA claimant is essentially the same as that afforded Title VII claimants[.]")).

discrimination. *E.E.O.C. v. Joe's Stone Crab, Inc.*, 15 F. Supp. 2d 1364, 1380 (S.D. Fla. 1998); *see also James v. Stockham Valves and Fittings Co.*, 559 F.2d 310, 358 (5th Cir. 1977)(holding that front pay should be limited to the date a victim of discrimination attains an opportunity to move to his "rightful place"). If the court is not convinced of the appropriate amount or time period to award as front pay, the court is allowed to conduct further proceedings as necessary to make the required determinations. *Reneau v. Wayne Griffin & Sons, Inc.*, 945 F.2d 869, 871 (5th Cir. 1991).

In this case, the court desires further assistance from the parties in determining the appropriate time period and amount of front pay. As noted earlier, the amount of the jury's back pay award in this case suggests that the jury found that Plaintiff failed to mitigate his damages. *See* discussion pages 58-60 *supra*. In calculating front pay, the parties should take into account, and outline the impact of, the jury's decision to award only $93,990.38 in back pay, which closely approximates two years of Plaintiff's base salary without benefits. The parties should also consider whether the amount of front pay should be calculated using present dollar valuation or future dollar valuation.

After the court receives the parties' submissions on this issue, it will determine the appropriate amount of front pay based not only on the evidence presented at trial, but also the court's experience with Title VII employment discrimination cases, *see Castle*, 837 F.2d at 1562, and a review of relevant case law.

### C.     Prejudgment Interest

Plaintiff has also requested an award of prejudgment interest on the jury's back pay award. Although the prevailing view is that the decision to award prejudgment interest on back pay is discretionary, *George v. GTE Directories Corp.,* 114 F. Supp. 2d 1281, 1300 (M.D. Fla. 2000);

*Gloria v. Valley Grain Products, Inc.*, 72 F.3d 497, 500 (5th Cir. 1996),[51] many courts apply a presumption of entitlement to prejudgment interest on an award of back pay to a successful Title VII plaintiff. *Richardson v. Tricom Pictures & Productions, Inc.*, 334 F. Supp. 2d 1303, 1317 (S.D. Fla. 2004); *Drews v. Social Dev. Com'n*, 95 F. Supp. 2d 985, 991 (E.D. Wis.1998); *Robinson v. Southeastern Pa. Transp. Auth.*, 1993 WL 126449, *2 (E.D. Pa.1993).   In determining whether to award prejudgment interest, courts take into account both the failure to mitigate damages and whether the back pay amount is easily ascertainable. *See Booker v. Taylor Milk Co., Inc.*, 64 F.3d 860, 869 (3d Cir. 1995) ("[a Title VII] plaintiff's failure to mitigate damages, alone, is insufficient to overcome the presumption in favor of a prejudgment interest award"); *Richardson*, 334 F. Supp. 2d at 1317 (collecting cases and noting that many courts take the failure to mitigate into consideration on the issue of prejudgment interest); *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1047 (7th Cir. 1994) (finding that prejudgment interest is element of complete compensation and normal incident of relief under Title VII; therefore, uncertainty introduced by jury's finding of partial failure of Title VII plaintiff to mitigate her damages did not suffice to defeat presumption in favor of prejudgment interest given that, without it, compensation of plaintiff was incomplete and defendant had incentive to delay); *Daniels v. Pipefitters' Association Local Union No. 597*, 945 F.2d 906 (7th Cir. 1991) (holding that prejudgment interest is available so long as the amount is readily

---

[51] The Eleventh Circuit has noted, "this court [has] reserved ruling on whether the decision to award prejudgment interest in a Title VII back pay case lies within the discretion of the district court." *E.E.O.C. v. Guardian Pools, Inc.*, 828 F.2d 1507, 1512 (11th Cir. 1987) (citing *Smith v. Am. Serv. Co. of Atlanta, Inc.*, 796 F.2d 1430, 1432-33 (11th Cir. 1986)).   More recently in an ADEA case, the Eleventh Circuit held that an award of prejudgment interest is discretionary with the court. *Wilson v. S & L Acquisition Co., L.P.*, 940 F.2d 1429, 1439 (11th Cir. 1991).

ascertainable); *E.E.O.C. v. Accurate Mech. Contractors, Inc.*, 863 F. Supp. 828 (E.D. Wis. 1994) (finding that the decision whether to grant or deny prejudgment interest in Title VII action is dependent on whether the amount of damages is easily ascertainable).

After balancing the equities, the undersigned will exercise his discretion and award prejudgment interest on Plaintiff's back pay award to compensate him for the value of money he lost over time due to Defendant's discriminatory acts[52] because the court finds that it is fair and necessary to make Plaintiff whole, it is in accordance with the remedial purposes of Title VII, because Plaintiff's back pay is easily ascertainable, and because the likely finding of the jury that Plaintiff failed to mitigate his damages is insufficient to overcome the presumption in favor of prejudgment interest.  Having determined that prejudgment interest is appropriate, the court notes that the "interest rate for prejudgment interest on back pay awards under Title VII depends on the IRS prime rates calculated in accordance with 28 U.S.C. § 1961."  *McKelvy v. Metal Container Corp.*, 854 F.2d 448, 454 (11th Cir. 1988).  Before officially awarding prejudgment interest, the court will invite the parties to submit, preferably by agreement, a proposed calculation of prejudgment interest on the jury's back pay award based upon the average IRS prime rate during the relevant time period.[53]

## IV.   Conclusion

After careful consideration of the parties' motions and the evidence presented at trial, the court finds that because sufficient evidence supports the jury verdict, Defendant's Rule 50(b) motion

---

[52] The court is not persuaded by Defendant's pure speculation that the jury could have taken into account the time-value of money based upon the charge that "lost wages . . . is the amount plaintiff would have earned in his employment . . . if he had remained employed."  (Doc. # 204, at 9).

[53] If the parties cannot agree, they shall submit separate calculations of interest, and their method for calculating must be supported by proper legal authority.

is due to be denied.  The court also finds that the jury's verdict was not against the great weight of the evidence, nor were the court's decisions to admit certain types of evidence improper so as to warrant a new trial, nor were the jury's damage awards in excess of the amount established by the evidence.  Thus, Defendant's Rule 59 motion is also due to be denied.  Although the court finds that reinstatement is not an appropriate equitable remedy, it does find that an award of front pay and prejudgment interest are both appropriate, although it will first ask the parties' input as to these awards before entering final judgment.  A separate order will be entered.

      **DONE** and **ORDERED** this     24th     day of May, 2006.

                                **R. DAVID PROCTOR**
                                UNITED STATES DISTRICT JUDGE